Raymond McCLELLAN, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

Supreme Court of Kentucky.

June 12, 1986.

Rehearing Denied Sept. 25, 1986.

Frank W. Heft, Jr., Daniel T. Goyette, Office of the Jefferson District Public Defender, Louisville, for appellant.

David L. Armstrong, Atty. Gen., David A. Smith, David W. Mossbrook, Asst. Attys. Gen., Frankfort, for appellee.

VANCE, Justice.

Raymond T. McClellan was convicted of the murder of Gary Stutzenberger; first-degree burglary of an apartment occupied by Stutzenberger and McClellan's wife, Bernadette McClellan; and the kidnapping of Bernadette. He was sentenced to imprisonment for 20 years on the charge of kidnapping, 20 years on the charge of first-

degree burglary, and death on the conviction of murder.

On appeal, McClellan raises 50 separate issues for review. Because we are reversing the judgments of conviction, we will review in this opinion those issues which necessitate the reversal, as well as those issues which may recur in a second trial. We will not enlarge the opinion to review issues which we deem to be without merit or which are not likely to arise in another trial.

Raymond McClellan was the fifth husband of Bernadette McClellan. Her third husband was the decedent, Gary Stutzenberger. Raymond met Bernadette in 1980 when she was employed as a waitress in a topless bar in Louisville, Kentucky. Bernadette testified that about a week before Gary was murdered, Raymond threatened her with a knife, and she separated from him and returned to work at the topless bar. There she encountered her former husband, Gary, and eventually moved into his apartment.

Raymond was unsuccessful in his attempts to persuade Bernadette to return to him. Just two days before the homicide, he purchased a rifle. On the day before the homicide his automobile collided with a van driven by Gary, in which Bernadette was a passenger. Raymond followed the van as it drove away, and eventually wound up at a police station where a warrant was taken for Raymond's arrest.

That evening, Raymond rented an apartment in the same building in which Gary and Bernadette were living. In the early morning hours he heard them return home. Armed with his rifle, he went to their apartment, knocked on the door and identified himself as a police officer.

Gary opened the door, but slammed it shut and locked it when he saw Raymond. Raymond then shot the lock off the door, and forced his way into the apartment. When Bernadette emerged unclothed from beneath the bed, Raymond shot and killed Gary, kidnapped Bernadette, and took her from the building. They eventually proceeded to a farmhouse in Indiana where they were surrounded by police, and he was forced to surrender.

## SUFFICIENCY OF THE EVIDENCE

The appellant contends that the evidence was insufficient to support the conviction for first-degree burglary for the reason that it failed to prove that he entered or unlawfully remained in the room with intent to commit a crime. He relies upon his testimony that his sole purpose in entering the room was to talk to his wife and to attempt to persuade her to return home with him. He repeatedly testified that he had no thought of harming his wife or the victim or of committing any crime whatsoever when he entered the room.

Criminal intent, of course, can be inferred from the circumstances. There was evidence in this case that appellant had purchased the fatal weapon shortly before the homicide; evidence to indicate that he sat up waiting for the victims to return to the apartment; that when denied entrance to the apartment, he shot the lock off the door and forced his way into the apartment; and within a very brief time shot and killed Stutzenberger.

■ After viewing the evidence in the light most favorable to the prosecution, we hold that any rational trier of fact could have found beyond a reasonable doubt that appellant entered the room with an intent to commit a crime. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ Even though the evidence was sufficient to justify a first-degree burglary verdict, the jury could have believed appellant's testimony that he had no intent to commit a crime when he entered the room. In that case, he would have been guilty of criminal trespass only, and he was entitled to his requested instruction setting out his theory of the case.

K.R.S. 511.020(1) pertains to burglary in the first degree. It provides:

"A person is guilty of burglary in the first degree when, with the intent to

commit a crime, he knowingly enters or remains unlawfully in a building, and when effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

"(a) Is armed with explosives or a deadly weapon; or

"(b) Causes physical injury to any person who is not a participant in the crime; or

"(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime."

K.R.S. 511.060(1), pertaining to first-degree criminal trespass, provides:

"A person is guilty of criminal trespass in the first degree when he knowingly enters or remains unlawfully in a dwelling."

There is no question in this case but that appellant knowingly entered and unlawfully remained in the victim's apartment. There is also no question but that while therein he was armed with a deadly weapon, used a dangerous instrument against a person not a participant in the crime, and caused physical injury and death of that person.

The question of whether appellant intended to commit a crime when he entered the apartment was a question to be determined by the jury. Unfortunately, there was no instruction to the jury which would permit it to find that appellant entered the apartment unlawfully, but without an intent at that time, to commit a crime. This omission from the instructions was erroneous, and it is crucial in this case because the imposition of the death penalty was predicated upon the aggravating factor that the homicide was committed during the course of a first-degree burglary. Had the jury found appellant guilty of criminal trespass in the first degree rather than burglary in the first degree, the death penalty could not have been imposed.

## EXTREME EMOTIONAL DISTURBANCE

Appellant raises several issues relating to "extreme emotional disturbance." He claims the evidence was such that no rational trier of fact could fail to conclude that appellant acted under extreme emotional disturbance for which there was a reasonable explanation or excuse; that the Commonwealth Attorney in his concluding argument misstated the law concerning extreme emotional disturbance at both the guilt and penalty phases of the trial; and that K.R.S. 507.020 and 532.025 are void for vagueness because there is no definition of the term "extreme emotional disturbance."

The General Assembly has provided that a person shall not be convicted of murder for an intentional homicide which is committed while acting under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse. K.R.S. 507.020. The General Assembly did not define what state of mind constitutes "extreme emotional disturbance," and this court has never evolved any precise determination of that term. It was said in *Edmonds v. Commonwealth*, Ky., 586 S.W.2d 24, 27 (1979) that definition of the term is unnecessary and that, "we know it when we see it."

To say that, "we know it when we see it," overlooks the fact that it is not the court but a jury that must make a factual determination of whether a particular defendant acted under the influence of extreme emotional disturbance. Without some standard or definition a jury is left to speculate in a vacuum as to what circumstances might or might not constitute extreme emotional disturbance. Since the General Assembly did not define the term, it becomes necessary for the court to do so.

We must begin with a distinction between mental disease or illness and emotional disturbance. Insanity is defined as a mental condition which results in a lack of substantial capacity either to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law.

K.R.S. 504.060(4). A person who is insane is not responsible for criminal conduct. Insanity absolves one of criminal intent and is therefore a complete defense. K.R.S. 504.020. On the other hand, a mental disease which does not destroy the capacity to appreciate criminality of conduct or to conform one's actions to the requirement of law is simply not a defense at all. It does not relieve one of criminal responsibility. *Edwards v. Commonwealth,* Ky., 554 S.W.2d 380 (1977).

Mental illness is defined as substantially impaired capacity to use self-control, judgment, or discretion which can be related to physiological, psychological, or social factors. K.R.S. 504.060(5). Mental illness does not absolve one of criminal responsibility but entitles one so convicted to treatment so long as he remains mentally ill or until the expiration of his sentence. K.R.S. 504.150.

A defendant who intends to introduce evidence of his mental illness or insanity at the time of the offense is required to file written notice of his intention at least 20 days before trial. K.R.S. 504.070.

It is easy in the vernacular to equate insanity, mental disease, and mental illness with emotional disturbance, but in law they are separate and distinct concepts. Extreme emotional disturbance is something different from insanity or mental illness. *Wellman v. Commonwealth,* Ky., 694 S.W.2d 696 (1985).

In *Ratliff v. Commonwealth,* Ky., 567 S.W.2d 307 (1978), this court indicated that extreme emotional disturbance was akin to a lesser-degree defense of insanity. Ratliff suffered from schizophrenia—paranoid type and experienced delusions of conspiracies against her. She shot and killed a store clerk whom she believed to be a conspirator against her. It was held that a jury might reasonably believe that she was not legally insane, but was nevertheless emotionally disturbed.

■ Our holding in *Ratliff, supra,* was in error. A mental disease which does not in itself result in a lack of capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law does not rise to the level of insanity, nor does it, in itself, constitute extreme emotional disturbance. As we noted in *Wellman v. Commonwealth, supra,* an underlying mental disease may be considered by a jury in making its determination of whether a defendant's explanation or excuse for his alleged "extreme emotional disturbance" is reasonable under the circumstances as he believed them to be, but standing alone, evidence which tends to establish insanity or mental illness is not sufficient to establish extreme emotional disturbance. To the extent that *Ratliff v. Commonwealth, supra,* indicates otherwise, it is expressly overruled.

■ Extreme emotional disturbance for which there is a reasonable explanation or excuse does not exonerate or relieve one of criminal responsibility. It simply reduces the degree of a homicide from murder to manslaughter. In that respect, it serves the same function as "acting in sudden heat of passion" in pre-penal code times.

There is little doubt that the phrase "extreme emotional disturbance" is a replacement for the old "sudden heat of passion" but is somewhat less limited in its application. The commentary to K.R.S. 507.030 explains that a reasonable explanation of extreme emotional disturbance is not limited to specific acts of provocation by the victim but may relate to any circumstance that could reasonably cause an extreme emotional disturbance. Although its onset may be more gradual than the "flash point" normally associated with sudden heat of passion, nevertheless, the condition must be a temporary disturbance of the emotions as opposed to mental derangement per se.

■ Extreme emotional disturbance may reasonably be defined as follows: Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or mali-

cious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

The evidence in this case was not such that a rational trier of fact would be compelled to conclude that appellant acted under extreme emotional disturbance. The Commonwealth Attorney, in his argument at both the penalty phase and the guilt phase of the trial, compared the term "extreme emotional disturbance" with the former "sudden heat of passion" and stated that extreme emotional disturbance must be the product of specific acts of provocation of the victim and did not apply in this case because there was an ample cooling off period. On another trial, argument should be limited in this regard to whether or not the appellant at the time of the shooting was so inflamed or disturbed that he acted uncontrollably from that fact, rather than from an evil or malicious purpose, and if so, whether there was, in fact, a reasonable explanation or excuse for such an emotional state.

The jury should be instructed as to the definition of the state of mind which constitutes an extreme emotional disturbance.

### KIDNAPPING

K.R.S. 509.040 provides that a person is guilty of kidnapping when he unlawfully restrains another person and when his intent is to use him as a shield or hostage or to inflict bodily injury or to terrorize the victim or another. The appellant claims there was no evidence of his intent to terrorize his wife, inflict injury upon her, or to hold her as a hostage, and that, in any event, any acts of terrorism or holding hostage occurred in Indiana rather than Kentucky. It is without question that appellant unlawfully restrained Bernadette in Jefferson County, Kentucky. The question

here is not whether appellant actually held her as a hostage or terrorized her, but whether he intended to do so at the time he unlawfully restrained her. The fact that he did subsequently hold her as a hostage, albeit in Indiana, is a circumstance going to the issue of his intent at the time of the abduction. Bernadette testified that he dragged her down the stairs, that she did not want to go with him, that she did so only because she was frightened, and that subsequently, in Indiana, he pointed a gun at her and held her as a hostage when he was besieged by the police.

■ We hold that the evidence was sufficient to permit a jury to find beyond a reasonable doubt that appellant intended at the time of the abduction both to terrorize Bernadette and to hold her as a hostage.

The court also instructed the jury on the offense of unlawful imprisonment in the first degree, but refused to instruct upon the offense of unlawful imprisonment in the second degree.

K.R.S. 509.020(1) provides:

"A person is guilty of unlawful imprisonment in the first degree when he knowingly and unlawfully restrains another person under circumstances which expose that person to a risk of serious physical injury."

K.R.S. 509.030(1) provides:

"A person is guilty of unlawful imprisonment in the second degree when he knowingly and unlawfully restrains another person."

■ The appellant maintained throughout the trial that his acts were motivated out of love and concern for his wife and her child and in an attempt to preserve the family relationship. The evidence that appellant unlawfully restrained his wife with the intent to terrorize her or to hold her as a hostage was not so overwhelming as to preclude a jury finding of guilt on the lesser included offense of unlawful imprisonment in the second degree.

On another trial, if the evidence on unlawful restraint is the same, the jury should be instructed on both kidnapping

and unlawful imprisonment in the second degree.

The instruction on unlawful restraint in the first degree was as follows:

"If you do not find the defendant, Raymond McClellan, guilty under Instruction No. 7, you will find him guilty under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

"(a) That in this county on or about January 5, 1981, and before the finding of the indictment herein, he restrained Bernadette C. McClellan by taking her to Indiana and holding her in a farmhouse or automobile;

"(b) That he did so knowingly and without Bernadette C. McClellan's consent;

"AND

"(c) That the restraint occurred under circumstances that exposed Bernadette C. McClellan to a risk of serious physical injury.

"If you find the defendant, Raymond McClellan, guilty under this instruction, you will fix his punishment at confinement in the penitentiary for not less than one (1) year nor more than five (5) years, in your discretion."

The instruction authorized the jury to find guilt if Bernadette was exposed to the risk of serious physical injury in Indiana but did not authorize a finding of guilt for the exposure to such risk in the state of Kentucky. Appellant contends this was prejudicial because the jury was not permitted by the instructions to find appellant guilty of the lesser offense if it believed that the unlawful imprisonment exposed Bernadette to the risk of a serious physical injury in Kentucky.

We are not cited to any incident which is claimed to have resulted in exposure to risk of serious physical injury in Kentucky. The Commonwealth contends that the unlawful restraint in Kentucky coupled with exposure to the risk of serious bodily harm in Indiana is sufficient to raise the charge of unlawful imprisonment in the first degree.

The evidence of what occurred in Indiana is relevant to the kidnapping charge because the gravamen of the offense there is the appellant's intent at the time the abduction occurred in Louisville. Later events in other places can give rise to an inference of intent.

■ The gravamen of unlawful imprisonment in the first degree is not unlawful restraint with intent to expose the victim to the risk of serious physical injury. Instead, the gravamen is an unlawful restraint under circumstances which actually expose the victim to a risk of serious physical injury. For Kentucky to have jurisdiction of that offense, we hold that both the unlawful restraint and the circumstances which expose the victim to a risk of serious physical injury must occur in Kentucky. On another trial, an instruction on unlawful restraint in the first degree should be given only if the evidence reveals that the victim was exposed to a risk of serious physical injury in Kentucky.

## UNLAWFUL SEARCH

Appellant contends that his conviction must be reversed because evidence obtained as a result of an unlawful search was admitted at trial. The door to the apartment appellant had rented was ajar when police officers entered the building. The building reeked of the smell of gunpowder, and an unknown bystander indicated that the shooting might have occurred in that apartment.

A police officer entered the apartment to determine whether appellant was still in the apartment and whether any injured person was there. While in the apartment he saw in plain view a cup and a hamburger box on the windowsill and a box, of a type which could contain a rifle, upon the bed. These items were subsequently seized when officers returned to the apartment after completing their investigation elsewhere. They were admitted in evidence at trial.

Appellant concedes that exigent circumstances existed to justify the original war-

rantless entry of the apartment. He maintains, however, that once the police left the apartment after discovering that neither appellant nor any injured person was within the apartment, no exigent circumstances justified the officer's re-entry and search of the apartment thereafter.

We take note that nothing was taken from the apartment that was not seen by the officer in plain view upon the initial entry. The officer could, and did, testify that he saw these items in plain view.

■ The only prejudice appellant ascribes to this procedure is that the admission into evidence of the coffee cup and hamburger box enabled the prosecutor to argue before the jury that appellant lay in wait for the victims to return home, watching for them from a window while eating a hamburger. This same argument could have been made upon the basis of the testimony of the officer who initially entered the apartment, even if the items had not been introduced into evidence. We see no error in the admission of these items into evidence, and also hold beyond a reasonable doubt that appellant was not prejudiced by the admission.

## IMPROPER CROSS–EXAMINATION

Allen Bartlett, Dean of Christ Church Cathedral, testified that appellant was sincere and was sorry for his acts. On cross-examination he was asked:

"You say the person says they're sorry about the acts he's committed. One of the acts he committed was murder. He's talking to you. You say he appears to be sincere about having committed that, and all I'm asking you is if the person had, sometime within the last couple of weeks, had made the statement, in effect, I killed the wrong person, do you think that would be an indication that he was still sincere about having committed the offense?"

No evidence was introduced that appellant ever made the statement that he killed the wrong person. Appellant moved for mistrial as follows:

"We have one other motion that we want to make just for the record, and that is a motion for a mistrial based upon the final series of questions that Mr. Jasmin asked Dean Bartlett. The questions inferred that Raymond McClellan had made some statement to somebody about that he wished he had killed another party recently. We assumed that Mr. Jasmin was going to put on some evidence to that effect. Since no evidence was put on, we would ask for a mistrial in that the question was extremely prejudicial to the defendant. It assumed a circumstance which is not in evidence and in that respect the question is an unethical question."

An inference could be drawn from the statement attributed to appellant by the prosecutor's question that appellant was not remorseful about the shooting or that he was sorry only because he had killed the wrong person.

■ This constitutes a prejudicial error that shall not be permitted to recur upon retrial. *Coates v. Commonwealth*, Ky., 469 S.W.2d 346 (1971), *Woodford v. Commonwealth*, Ky., 376 S.W.2d 526 (1964), *Rowe v. Commonwealth*, Ky., 269 S.W.2d 247 (1954).

## FIRST–DEGREE BURGLARY AS AN AGGRAVATING FACTOR

Appellant contends first-degree burglary cannot be used as an aggravating factor upon which the death penalty is based. The argument is two-fold. First, it is contended that to constitute an aggravating factor, an offense must be completed before the murder takes place. Appellant contends here, that the burglary was not complete until the murder was committed because otherwise there was no evidence that appellant unlawfully entered the premises with intent to commit a crime.

It is also contended that the intent to commit the crime of murder elevated the charge of burglary to burglary in the first degree, and burglary in the first degree elevated the murder to a capital offense. Appellant thus claims that without the

murder there was no burglary in the first degree, and without burglary in the first degree there was no capital murder.

■ These contentions are without merit. The crime of first-degree burglary was complete once appellant unlawfully entered the premises while armed with an intent to commit a crime. A jury could reasonably find that he entered the building with intent to kidnap or unlawfully restrain his wife or that he intended to murder Stutzenberger. Regardless, if he intended to commit any crime, the offense of first-degree burglary was complete upon the unlawful entry.

■ Appellant also claims that the burglary itself did nothing to make the murder more aggravated. We hold that an unlawful entry into a building while armed, with an intent to commit a crime, is a substantially aggravated circumstance to be considered by a jury in determining the appropriate punishment for homicide. The consideration of the aggravated circumstance in this case was in accord with the procedures approved by the United States Supreme Court in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

### RECOMMENDATION OF SENTENCE

Appellant contends that he was prejudiced because the jury was instructed to recommend rather than fix the penalty upon conviction. We have faced this troublesome question on more than one occasion. The statutes of Kentucky direct that the jury will recommend the sentence in the penalty phase. K.R.S. 532.025(1)(b).

■ We have concluded that use of the word *recommend* in the instructions, voir dire, or otherwise is not a sufficient ground to require reversal of a death sentence unless the idea of a jury recommendation is so prevalent that it conveys the message that the jurors' awesome responsibility is lessened by the fact that their decision is not final but is only a recommendation.

We are not cited to any use of the word "recommendation" as to sentence except in the instructions. We find that the use was

not sufficient to require reversal under *Ice v. Commonwealth*, Ky., 667 S.W.2d 671 (1984); *Ward v. Commonwealth*, Ky., 695 S.W.2d 404 (1985); or *Caldwell v. Mississippi*, 472 U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

The appellant contends that the trial court failed to consider the appropriateness of the death penalty because it refused to hear evidence, except by way of avowal, comparing the nature of the acts committed by appellant with the nature of acts which were committed by others who escaped the death penalty by negotiated pleas of guilty or by jury verdicts imposing a penitentiary sentence.

K.R.S. 532.025(1)(b) provides:

"In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted in the same manner as presentence hearings conducted before the judge as provided in paragraph (a) of this subsection. Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in subsection (2) of this section, exist and to recommend a sentence for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law."

We have held that under this statute, when a jury recommends the death penalty, a trial judge is authorized to reduce the sentence to a term of imprisonment within the limits prescribed by law. *Smith v. Commonwealth*, Ky., 634 S.W.2d 411 (1982); *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980). We have not held that a trial judge must conduct a proportionality review.

■ The Supreme Court is required by K.R.S. 532.075(3)(c) to determine whether the sentence of death is excessive or dis-

proportionate to the penalty imposed in similar cases considering both the crime and the defendant. We hold that in the exercise of his discretion in the imposition of sentence, a trial judge is not required to conduct a proportionality review. That review will be conducted by the Supreme Court in the event the death penalty is imposed.

The record here reflects that the trial judge, at the sentencing hearing, heard testimony from the appellant, the appellant's uncle, and a minister, and listened to extensive argument from appellant's counsel concerning the propriety of the death penalty.

The trial judge summed up his reasons for accepting the recommendation of the jury as follows:

"THE COURT: Defendant's prior criminal record, his emotional and mental condition, the fact that he is—the violent and dangerous nature of his crime, his failure to benefit any previous convictions, the deliberate nature of the crimes—he stalked this person for three days—and his general antisocial attitude. As I see it, he was sentenced for auto stealing one to ten years. I didn't even consider that previously because I didn't know if he was 21 or not, 21 or 18. We had a jailbreak which I didn't consider. Then you had second-degree burglary, one of them in 1962—now whether that's one in 1964 or not, it doesn't make too much difference to me because that was a serious crime to begin with and you had two bank robberies on top of it. And then escape. And then we have this murder, burglary and kidnapping and the facts that I heard in this particular case, he stalked this man for several days and it was a completely deliberate act. There was a lot of question whether he even knew the person. The man was wounded, lying on the ground, he shot him, the fellow was begging for mercy like he's begging for mercy now. He took his wife, and according to her own testimony, he held a knife at her throat. He abducted her. And the only reason why

they stopped him, because he tried to run a policeman over. The policeman dived under a car and shot his tire out. Apparently his attitude runs to anything he wanted to do he can do. Then he holed his wife up at a stranger's house and they had the whole Vevay police and the state police out there tied up all afternoon. He threatened, threatened and threatened, yet he claimed he loved the woman. He wouldn't let her get away. And finally by some ruse they did get a hold of him. Fortunately nobody else was killed. Now it seems in that recitation of facts which I heard in court under oath, I see no reason why mercy should be given here. No sufficient cause shown. To withhold rendition of this judgment would unduly depreciate the seriousness of the defendant's crime."

This record does not support a contention that the trial court refused to consider under any circumstances a reduction of the sentence recommended by the jury. Rather, it demonstrates that he did hear evidence and argument concerning propriety of the death sentence and determined that, under the circumstances of this case, it was an appropriate penalty.

We find that other errors alleged by appellant are not of sufficient merit to justify extension of this opinion.

For the reasons stated herein, the judgments of conviction are reversed, and the case is remanded for further proceedings consistent with this opinion.

STEPHENS, C.J., and WHITE, GANT and VANCE, JJ., concur.

LEIBSON, J., concurs by separate attached opinion.

STEPHENSON, J., dissents by separate attached opinion in which WINTERSHEIMER, J., joins.

LEIBSON, Justice, concurring.

Respectfully, I disagree with including the word "uncontrollably" within the definition for "extreme emotional disturbance" which is contained in the majority opinion.

The word "uncontrollably" applies more suitably to the mental state associated with temporary insanity than it applies to the mental state associated with extreme emotional disturbance. KRS 504.060 defines "insanity" to mean "that, as a result of mental condition," one lacks "substantial capacity ... to conform one's conduct to the requirements of law." Insanity is a complete defense. KRS 504.120.

On the other hand "extreme emotional disturbance" does not exculpate the actor from criminal responsibility; it merely reduces the crime from murder to manslaughter, or from assault to the lesser offense of assault under extreme emotional disturbance.

The nature of extreme emotional disturbance is illuminated by KRS 508.040, which states in pertinent part:

"(1) In any prosecution [for assault] in which intentionally causing physical injury or serious physical injury is an element of the offense, the defendant may establish in mitigation that he acted under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020 [the murder statute]."

When the statute declares that being "under the influence" of "extreme emotional disturbance" is sufficient to *mitigate* criminal liability, it seems apparent that the legislature intends for the defendant to be able to utilize it "in mitigation" so long as it *contributes* to cause the act, rather than limiting its application to where it is an exclusive cause of the criminal act. Wherever the evidence shows that the defendant's emotionally disturbed state was a contributing factor causing him to commit the criminal act, he should be entitled to mitigation of the degree of the offense to the lesser degree. The statutory scheme does not require that extreme emotional disturbance be the sole or exclusive cause of the act, as the word "uncontrollably" seemingly implies.

Next, assuming that on remand the defendant is again tried for capital murder, and that he is again convicted of murder, we should require a refinement in the instruction defining the use of Burglary I as an aggravating factor placing the defendant in the death eligible class. Burglary I should not be utilized as an aggravating factor if the jury believes that the crime that the defendant intended to commit when he unlawfully forced his way into the victim's room was to shoot the victim. Burglary I should only be utilized to elevate murder to aggravated murder, sufficient to impose the death penalty, if the jury believes that the defendant's intent when he broke into the room was to commit some crime other than assaulting Stutzenberger with a gun. Otherwise, the same criminal intent, the intent to shoot Stutzenberger, is being utilized twice, first to prove the burglary and then to enhance murder to capital murder. This is double enhancement contrary to the theory of *Boulder v. Commonwealth*, Ky., 610 S.W.2d 615 (1980). It is also contrary to the theory of *Polk v. Commonwealth*, Ky., 679 S.W.2d 231 (1984), which implies that assault should not be separately punished from burglary except when it is an additional, gratuitous act.

In *Collins v. Lockhart*, 754 F.2d 258, 263–4 (C.C.A. 8 1985), the United States Court of Appeals was confronted with the same problem, whether the "double counting" of "one aspect of the evidence" to prove both the intent behind the murder and the aggravating circumstance is constitutionally impermissible. The Court stated the "question is":

"[W]hether use of an aggravating circumstance that duplicates an element of crime itself is a violation of the Eighth Amendment.... Aggravating circumstances, in order to comply with the Eighth Amendment, must 'genuinely narrow the class of persons eligible for the death penalty....' "

The Court then answered the question:

"We see no escape from the conclusion that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform this narrowing function."

Burglary is not an end in itself. It is a crime of means, a means to an end, that end being the commission of some other offense after entry has been obtained. If the intent behind the burglary was murder, the murder that followed was not accompanied by an aggravating factor as necessary to place the accused in the death eligible class.

KRS 532.025 should not be construed as qualifying murderers for the death penalty on the basis of "situs." Murder carried out on one side of a door should not qualify for the death penalty where the same murder on the other side would not. Death is not an appropriate penalty simply by reason of location. This is not what the United States Supreme Court meant by a rule requiring additional statutory aggravating factors before placing the murderer in the select group that should be eligible for the death penalty. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). This is an arbitrary classification in violation of the United States Supreme Court's interpretation of the Eighth Amendment protection against cruel or unusual punishment.

We should instruct the trial court that upon a new trial the jury may only utilize burglary to place the accused in the death eligible class if it believes that the purpose of the burglary was to commit some crime other than murder, and further believes that, after gaining entry, the defendant then formed the intent to commit murder.

STEPHENSON, Justice, dissenting.

I am in complete agreement with the excellent analysis and definition of extreme emotional disturbance contained in the majority opinion.

However, I do not believe that the circumstances of this case warrant an instruction on criminal trespass. Had McClellan testified that he blacked out and remembered nothing, that would be the defendant's theory of the case and require an appropriate instruction. This theory is entirely subjective. Here, the testimony that he did not intend to commit a crime when he entered the room, after shooting off the lock and then proceeding to murder the victim and kidnap his wife, should be tested objectively by the jury. While McClellan's testimony can be considered by the jury on intent to murder, the facts here are such that, in my opinion, a criminal trespass instruction is not required.

The direct testimony of the Dean of Christ Church that McClellan was sincere and was sorry for his acts is incompetent and irrelevant; thus the cross-examination complained of can hardly be characterized as prejudicial.

Neither do I believe that McClellan was entitled to an instruction on unlawful imprisonment in the second degree.

Accordingly, I dissent.

WINTERSHEIMER, J., joins in this dissent.