**Gabrielle L. CECIL, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 92–SC–508–MR.

Supreme Court of Kentucky.

Oct. 27, 1994.

Rehearing Denied Jan. 19, 1995.

Oleh R. Tustaniwsky, Asst. Public Advocate, Dept. of Public Advocacy, Frankfort, for appellant.

Chris Gorman, Atty. Gen., Sharon Kay Hilborn, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

A Jefferson Circuit Court jury on February 14, 1992, convicted the appellant, Gabrielle Cecil, of the intentional murder, while mentally ill, of her former boyfriend, Ronnie Hibbard. The trial judge subsequently sentenced her to life imprisonment, as recommended by the jury. She appeals to this Court as a matter of right, and we affirm the conviction and sentence.

Ms. Cecil became acquainted with Mr. Hibbard and with Mrs. Loren Collard in about 1985, as all three worked for United Parcel Service (UPS). In June of 1988, shortly after Mrs. Collard's husband died in a vehicle accident, the two women began sharing an apartment. Ms. Cecil and Mr. Hibbard had begun dating off and on in 1987, and in the summer of 1988 Ms. Cecil pointed Mr. Hibbard out to Ms. Collard at work. In the spring of 1990, Mr. Hibbard started frequently visiting the two women at their apartment. By that summer, Ms. Collard and Mr. Hibbard began dating. At first, Ms. Cecil resented this, but after a time she apparently became reconciled and the three of them shared many activities, including a Florida vacation.

Little by little, Ms. Cecil, the appellant, began exhibiting mood swings, apparently becoming emotionally dependent on Ms. Collard, and becoming jealous of the time Ms. Collard spent with Mr. Hibbard. In August of 1990, Ms. Cecil's grandmother died, which seriously upset Ms. Cecil emotionally. She became even more dependent on Ms. Collard and more demanding.

In January of 1991, Ms. Collard moved out of the apartment she had shared with the appellant. The appellant nevertheless kept seeking out Ms. Collard and visiting her at Ms. Collard's new apartment in Shepherdsville. Ms. Cecil often visited the apartment late at night and created a lot of noise, especially when Mr. Hibbard was present. These visits resulted in threats of eviction from the apartment management and caused Ms. Collard on at least four occasions to call the police about the disturbance. Sometimes the appellant would telephone Ms. Collard's apartment and Mr. Hibbard would answer, resulting in arguments over the phone. Ms. Collard nevertheless encouraged Ms. Cecil to seek counseling about her problems and ultimately hospitalization. She even attended some therapy sessions with the appellant and visited her during Ms. Cecil's hospitalization in March of 1991.

On the evening of May 25, 1991, the appellant again went to Ms. Collard's apartment and got into an argument outside with Mr. Hibbard. Ms. Collard asked Mr. Hibbard to go back inside and Ms. Cecil to leave. Ms. Cecil remarked to Ms. Collard, "See, he won't let us be friends." When Mr. Hibbard and Ms. Collard left the apartment and drove

to Mr. Hibbard's trailer in a trailer park, the appellant followed them in her car. After sitting in her parked car for some fifteen minutes, the appellant went to the door of the trailer and knocked. Mr. Hibbard opened the door and went outside where he and the appellant talked loudly and scuffled. Mr. Hibbard's mother testified that she witnessed Ms. Cecil hitting Mr. Hibbard as hard as she could on the side of his head with her hand. Then Mr. Hibbard grabbed her by the arm and started struggling with her. The appellant later claimed he struck her in the mouth. When Ms. Collard got to the doorway, she saw Ms. Cecil sitting up against the garage, whereupon Ms. Cecil looked up at her and called her a "bitch." Then Ms. Cecil got in her car and left.

The very next morning, the appellant once again showed up at Ms. Collard's apartment, upset because Ms. Collard had not phoned her the previous evening. Mr. Hibbard was also at Ms. Collard's and called the Sheriff's office. By the time a deputy arrived, Ms. Cecil had left. When Ms. Collard and Mr. Hibbard drove away from the apartment, however, Ms. Cecil pulled her car out from behind a building and followed them. They all drove to a police station but the appellant stayed in her car. After Ms. Collard and Mr. Hibbard told the police about the difficulty, one of the officers went to the appellant's car to talk to her. Ms. Collard and Mr. Hibbard left in the meantime. The desk clerk also recalled that Mr. Hibbard had been in about a year earlier complaining that the appellant was chasing Ms. Collard and him. Similar confrontations by the appellant with Ms. Collard and/or Mr. Hibbard occurred almost daily.

On May 31, 1991, Ms. Collard told the appellant that she and Mr. Hibbard intended to get married. Ms. Cecil became angry but remained calm. During two phone conversations later that evening Ms. Collard thought the appellant was very upset. Later that night, at around two or three o'clock a.m., the appellant visited Ms. Collard's apartment. Ms. Collard told her to leave and she would talk to her later. This was repeated a few hours later, after daybreak.

Finally, later in the morning on June first, Ms. Collard and Mr. Hibbard drove to a Wal-Mart store at about eleven o'clock to buy a new telephone. The appellant saw Ms. Collard's car in the parking lot, parked her car nearby, and walked to the store. As Ms. Collard and Mr. Hibbard were leaving the store, they met Ms. Cecil in the doorway.

As the three of them were walking across the parking lot talking, the appellant raised a .38 pistol which she had been holding down at her side and shot Mr. Hibbard in the head. The pistol was about one foot away. Several eyewitnesses saw the shooting and heard the appellant scream, "I've shot him," and then thrust the pistol into the hands of a bystander as she ran into the store. She telephoned her mother and asked her to send her stepfather, saying, "It's bad, it's real bad."

Officer Keith Barnett of the Jefferson County Police Department was the first policeman to arrive at the scene. He took the appellant into custody and drove to the police station. When he called the hospital where Mr. Hibbard had been taken, he learned that Mr. Hibbard was dead. The appellant told the officer that Mr. Hibbard had abused her and that they had had a squabble the night before. She told the officer several times that she had "barely pulled the trigger and it went off."

The appellant later stated that she had put the pistol in her car on the day before the shooting and had put it in her pocket as she got out of her car and walked toward the store before the shooting. She also testified that she thought the victim "jumped" at her and the gun "went off." Tests on the pistol revealed that, had it been cocked, 3.2 pounds of pressure would have been required to fire it, but if it had not been cocked, ten pounds of pressure were necessary for firing. Investigation discovered that Ms. Cecil had bought the .38 caliber revolver on April 29, 1991, at a jewelry store/pawn shop for $125.

## I. JURY INSTRUCTIONS

The appellant argues that her conviction of guilty of intentional murder, but mentally ill, and her life sentence ought to be reversed for a new trial because of the refusal of the trial judge to give her tendered instructions

on first- and second-degree manslaughter, reckless homicide, self-defense, insanity, and temporary mental incapacity. The jury was given instructions and definitions only on intentional and wanton murder, guilty but mentally ill, presumption of innocence, burden of proof, and unanimous verdict. We disagree with the contention and find that the jury was properly instructed.

An intentional killing can be reduced from murder to first-degree manslaughter where the killer acts under the influence of extreme emotional disturbance. KRS 507.030(1)(b).

> Extreme emotional disturbance may reasonably be defined as follows: Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan v. Commonwealth*, Ky., 715 S.W.2d 464, 468–469 (1986).

The evidence before the trial court in this case supported a conclusion of intentional murder. The appellant bought the murder weapon only a month or so before the killing, as her relationship with the victim and Ms. Collard continued to deteriorate. She carried it in her automobile on the day of the murder when she followed the victim and Ms. Collard to the Wal–Mart parking lot. She removed the pistol from the car and carried it on her person as she stalked them into the store. Before they could return to Ms. Collard's car, Ms. Cecil drew the pistol, held it within a foot of the victim's head, and pulled the trigger. This was the only "triggering" event that occurred that day.

In *Foster v. Commonwealth*, Ky., 827 S.W.2d 670 (1992), we rejected a claim of extreme emotional disturbance because the defendant failed, as here, to offer any evidence of a "triggering" event. We stated at p. 678:

> Since the adoption of the penal code, we have undertaken to set out what evidence is required to support an instruction on extreme emotional disturbance. We have explained in prior opinions that the event which triggers the explosion of violence on the part of the criminal defendant must be sudden and uninterrupted. It is not a mental disease or illness. It is also not equivalent to duress as [a defendant] urges us to believe. Thus, *it is wholly insufficient for the accused defendant to claim the defense of extreme emotional disturbance based on a gradual victimization from his or her environment, unless the additional proof of a triggering event is sufficiently shown.* (Citations omitted.)

■ It is true that three mental health experts examined Ms. Cecil and found that she was mentally ill, suffering from "borderline personality disorder." Mental illness, however, as we have often observed, does not qualify as extreme emotional disturbance. *Wellman v. Commonwealth*, Ky., 694 S.W.2d 696 (1985).

Dr. Robert Noonan, a clinical psychologist, conducted a court-ordered evaluation of the appellant after the shooting. He saw her a total of four times and testified that the most prominent characteristics of this personality disorder were extreme intensity of emotion as well as changeability in attitude and behavior. He recognized that she had been under stress for a long time. The primary stress for her was the difficulty in handling the intensity of a close relationship and seeing that relationship slipping away. Although Dr. Noonan felt that the appellant's judgment was blurred and her behavior affected because of her emotions and the emotional stress she was under, he did not believe she suffered from insanity. He also testified that the appellant was acting intentionally and would *not* have shot the victim had a police officer been standing at her elbow.

Dr. Mary Davis, a psychiatrist, saw Ms. Cecil before the shooting and prescribed an

anti-depressant for her. She testified that Ms. Cecil's personality disorder included symptoms of difficulty in personal relationships, self-mutilative behavior, low self-esteem, difficulty in being alone, and temper.

Here the appellant, who was indeed found mentally ill by the jury as a part of their verdict that she was guilty of intentional murder, failed to prove any "triggering" event for the shooting. Rather, the evidence showed that the appellant acted with premeditation and out of extreme jealousy stemming from the "love triangle" in which she found herself.

■ There was no error in the trial judge's refusal to instruct on first-degree manslaughter. Similarly, there was no error in refusing to instruct on second-degree manslaughter or reckless homicide since the evidence was overwhelming that Ms. Cecil shot the victim intentionally or, at the very least, under circumstances manifesting extreme indifference to the value of human life, by wantonly engaging in such conduct as would create a grave risk of death to the victim. KRS 507.020(1)(a) and (b).

■ Finally, there certainly was no evidence that the appellant acted out of any need for self-protection; at most was her testimony that the victim might have "jumped" at her or "verbally abused her." No one could seriously contend that her use of deadly physical force was necessary at that time to protect herself against death or serious physical injury. KRS 503.050(2).

■ Although the appellant tendered an instruction on the defense of insanity, there was absolutely no proof that she lacked substantial capacity to appreciate the criminality of her act or was unable to conform her conduct to the requirements of the law. The instruction was properly refused. Still another instruction was tendered on "Temporary Mental Incapacity," as follows:

*TEMPORARY MENTAL INCAPACITY*-even though you may believe from the evidence that the Defendant fired the pistol that killed Ronnie J. Hibberd (sic), if you further believe from the evidence that at the time she did so, the Defendant was as a result of a pre-existing mental condi-

tions (sic) unconscious of her act, or her mind was thereby so impared (sic) and unsound that she did not have sufficient reason to know what she was doing, or to appreciate the criminality of her conduct, you shall find her NOT GUILTY.

Again, there was no error in refusing this instruction, since there was no proof in the record to substantiate such a defense. The appellant's statement to Officer Barnett that she "had barely pulled the trigger and it went off" was by itself sufficient to rebut any claim that she was "unconscious of her act" or that she "did not have sufficient reason to know what she was doing."

## II. OPINION TESTIMONY

■ For her second argument in urging reversal, the appellant now objects to some testimony elicited from Dr. Robert Noonan, the clinical psychologist who made the court-ordered mental evaluation of Ms. Cecil. First, we note that this issue was not preserved by contemporaneous objection at trial. We are nonetheless asked to review the matter under RCr 10.26 to prevent manifest injustice.

Dr. Noonan was questioned on direct examination as to whether the appellant met the criteria for insanity or mental illness. He responded that she was not psychotic and therefore not insane, but she would qualify as "mentally ill." The Commonwealth then followed this line of questioning on cross-examination with an inquiry as to whether in his opinion Ms. Cecil was acting intentionally in shooting Mr. Hibbard. Dr. Noonan at first replied, "That's a difficult one," and then testified that he would have to say "yes." When asked, Dr. Noonan stated that, in his opinion, Ms. Cecil would not have shot the victim if a police officer had been standing at her elbow (a classic test for the "irresistible impulse" or temporary insanity claim). In our opinion, this was proper cross-examination. Kentucky Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training, or education, may testify thereto in the form of an opinion or otherwise.

■ Expert witnesses such as Dr. Noonan can properly state opinions which are admissible concerning the sanity or insanity of criminal defendants. *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665 (1990).

Dr. Noonan's testimony was relevant and admissible for three reasons: See, *Dyer v. Commonwealth*, Ky., 816 S.W.2d 647 (1991).

1) Dr. Noonan was an expert in the field of clinical psychology and qualified to give the testimony.

2) The testimony rests on reliable foundation, that of the doctor's expertise and his examination of the appellant, and is vitally relevant to the task at hand. *Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (overruling *Frye v. U.S.*, 293 F. 1013 (1923)).

3) The testimony was offered to assist the trier of fact in understanding the evidence of mental illness, and determining the fact in issue of the appellant's ability to form intent to commit murder. KRE 702.

In accordance with the above, even though the appellant failed to preserve any objection to this testimony of Dr. Noonan, and even though we really see no manifest necessity to review the matter under RCr 10.26 in view of the overwhelming evidence that the appellant intentionally shot the victim, we nevertheless believe the testimony was properly admitted.

### III. TAPE–RECORDED CALL

■ The appellant's next claim of error centers on a telephone call made by the victim to a sheriff's dispatcher in Bullitt County which was tape-recorded. It was made on May 26, 1991, just six days before the shooting, and dealt with Mr. Hibbard's complaint of harassment by the appellant of Ms. Collard and him. The appellant's objection to the playing of the tape for the jury on the grounds of hearsay was overruled by the trial court. It is claimed that the statement of Mr. Hibbard on the tape was offered to prove the truth of the matter stated, but that it does not qualify as a recognized exception to the hearsay rule.

The Commonwealth responds that KRE 803(1) and (2) are applicable. They provide the following exceptions to the hearsay rule:

(1) *Present sense impression.* A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

(2) *Excited utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

■ In our opinion, either or both of the above exceptions apply to the tape of the phone call, and its admission was proper. Even if there was no exception covering the taped call, its admission was clearly harmless error at worst, given the whole of the testimony concerning the volatile relationship between the appellant and Mr. Hibbard.

### IV. PAROLE ELIGIBILITY

■ The final contention is that the parole and probation officer misinformed the jury as to appellant's minimum parole eligibility during the sentencing phase. In making this argument, the appellant states that the legislative amendment to KRS 439.3401(3) adding capital offenses to the provisions regarding eligibility for parole in Class A and B felonies was not effective until July 14, 1992. The Commonwealth replies that this is in error as the amendment referred to was enacted in a Special Session and became effective on February 15, 1991, some three and one-half months before the commission of the homicide herein. In a supplemental brief, the appellant concedes the Commonwealth's assertion. She nevertheless calls attention to our announcement in *Sanders v. Commonwealth*, Ky., 844 S.W.2d 391, 394 (1993), that KRS 439.3401(2) and (3) shall be interpreted to provide that parole eligibility for "violent offenders" shall be fifty percent of the term of years or twelve years, whichever is less. The argument is then made that, since appellant's jury was, of course, not advised of this interpretation, the sentence must be reversed. We do not agree. If appellant's sentence had been for a term of more than twenty-

four years, we would have reversed the sentence and remanded. Here, however, the jury recommended life imprisonment and were correctly informed of the parole eligibility therefor.

For all the above reasons, the judgment and sentence of the Jefferson Circuit Court are affirmed.

LAMBERT, REYNOLDS and WINTERSHEIMER, JJ., concur in this opinion by SPAIN, J.

STEPHENS, C.J., dissents by separate opinion in which LEIBSON and STUMBO, JJ., join.

LEIBSON, J., dissents by separate opinion in which STEPHENS, C.J., and STUMBO, J., join.

STEPHENS, Chief Justice, dissenting.

Respectfully, I dissent.

The majority maintains that Dr. Noonan's testimony regarding the appellant's criminal intent on cross-examination was properly admitted under Kentucky Rule of Evidence 702. I cannot agree. While it is proper to allow expert witnesses to state their opinions concerning the sanity or insanity of criminal defendants, this is not what occurred here. The testimony in question concerns a question of specific intent at a particular time rather than general opinion evidence of a mental condition. The witness was asked whether, in his opinion, the appellant was acting intentionally in shooting the victim, and he replied "yes." This line of questioning goes beyond the limits of what must be accepted as competent evidence admissible at trial. *See Koester v. Commonwealth,* Ky., 449 S.W.2d 213 (1970).

The majority is correct when it states that any evidence regarding the issue of intent at the time of the shooting is relevant; however, what was elicited from the witness was not evidence of intent but rather a factual conclusion of the witness. It is within the province of the jury to reach a conclusion as to the ultimate issue in this case, whether the appellant acted *intentionally* in shooting the victim. It is not proper to allow an expert to

testify as to the conclusion he himself has reached based upon the evidence.

RCr 10.26 allows this Court to review this unpreserved error since manifest injustice has resulted. The appellant's substantial rights have been affected as shown by the fact that the inadmissible testimony offered evidence on the ultimate issue to be addressed by the jury. With this inadmissible evidence, the jury found the appellant guilty of intentional murder. As a result, the Court of Appeals should be reversed.

For the foregoing reasons, I dissent.

LEIBSON and STUMBO, JJ., join this dissenting opinion.

LEIBSON, Justice, dissenting.

Respectfully, I dissent. We should vacate the judgment, reverse and remand because the trial court erred in failing to instruct on Manslaughter I (KRS 507.030) as a lesser included offense for the jury to consider along with the murder charge. An instruction under KRS 507.030 is warranted when there is evidence from which to infer the appellant "act[ed] under the influence of extreme emotional disturbance [EED], as defined in subsection (1)(a) of KRS 507.020." There was ample evidence here to so infer, and this requires an instruction permitting the jury to find this appellant was guilty of Manslaughter I (KRS 507.030), a Class B felony, rather than Murder (KRS 507.020), which requires the absence of EED.

EED is defined in KRS 507.020 by stating an accused shall "not be guilty" of murder "if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." KRS 507.020(1)(a). Thus, since the adoption of the Penal Code in 1974, "reasonableness" is to be decided using a *subjective* standard, "a person in the defendant's situation under the circumstances as the defendant believed them to be," rather than from the view of an objectively reasonable person. Our Court has overlooked this critical difference in nu-

merous cases, and continues to perpetuate this error. Our Court has continued to equate EED with killing under sudden heat of passion, despite the explanation in the Commentary to the Penal Code:

"The most significant change brought about by [KRS 507.030] subsection (1)(b) is an abandonment of the common law requirement [to reduce murder to manslaughter] that the killing occur in 'sudden heat of passion' upon 'adequate provocation.' ... [M]itigation is not restricted to circumstances which would constitute provocation 'in the ordinary meaning of the term,' ... [I]t is possible for any event, or even words, to arouse extreme mental or emotional disturbance, as that phrase is used here."

The evidence of the appellant's existing mental disorder, pushing her to the brink of a homicidal act in circumstances a normal person would not view as provocation, was a factor for the jury to weigh under an appropriate instruction on EED reducing Murder to Manslaughter I. It was a vital part of the equation. Yet, under the instructions it was not a factor. The appellant's mental disorder, when added to the appellant's testimony that the victim interfered with her access to the friend to whom she was obsessively attached, called her a name and jumped at her, required instructions on EED and Manslaughter I as a lesser included offense to the murder charge. While these circumstances would not be a sufficient triggering event for an ordinary, reasonable person, Ms. Cecil was clearly not an ordinary person. It was for the jury to determine whether, from the viewpoint of a person *in Ms. Cecil's situation under circumstances as Ms. Cecil believed them to be,* there was a reasonable explanation for her misconduct.

The Majority fails to appreciate that under the Penal Code EED is *not* a defense but simply a circumstance in "mitigation" (Commentary to KRS 507.030, quoted *supra* ). If it were a defense it would be covered by KRS Chapter 503 ("General Principles of Justification") rather than KRS Chapter 507 ("Criminal Homicide"). Nor is it an alternative description of legal insanity as covered by KRS Chapter 504 ("Responsibility"). In-

sanity requires a finding that "as a result of mental illness or retardation, [the defendant] lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirement of law." KRS 504.020(1). EED requires no such finding. Proof of insanity *acquits* a defendant, and this covers temporary insanity (or irresistible impulse) as well as longstanding insanity.

It is quite certain from the Commentary regarding EED in KRS Chapter 507, and from the Model Penal Code of the American Law Institute from which it derives, that mental dysfunction not amounting to insanity is part of the concept in assessing EED. The question is one of *diminished culpability,* not insanity, when assessing whether the criminal homicide is Murder or the lesser offense of Voluntary Manslaughter. Mental disorder not amounting to insanity is relevant for the jury to consider in deciding whether the accused, acting from a combination of mental dysfunction and a triggering event as the accused perceived it, is not guilty of the greater offense of murder.

In *Commonwealth v. McClellan,* Ky., 715 S.W.2d 464 (1986), our Court reduced the EED concept to the legal equivalent of temporary insanity or irresistible impulse. *McClellan* requires for EED that a jury find a "state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act *uncontrollably* from the impelling force of the extreme emotional disturbance *rather than* from evil or malicious purposes." *Id.* at 468–69. Emphasis added. The Penal Code section on EED does not require an "uncontrollable" act to the exclusion of "evil or malicious purposes." This is a gloss the court has added to the statute to return to the common law's sudden heat of passion. Rather, the Penal Code recognizes that a combination of significantly distorted mental perception and malice diminishes the degree of culpability. This is a case of irrational malice easily triggered to a homicidal act, and EED fits the case. The drafters of the Penal Code have written EED into the Penal Code as an element reducing murder to manslaughter, and we have written it out. No jury reading and applying the *McClellan* definition of EED

literally could apply it in any circumstance where it did not believe the accused acted from irresistible impulse, where the accused would have killed with a policeman at her elbow, but this is *not* the function for EED the Penal Code intended.

Manslaughter I is less culpable than Murder but it is, nevertheless, a serious crime, a Class B felony punishable by ten to twenty years in the penitentiary. To say a jury could reasonably infer in the circumstances presented that the appellant's culpable mental state was less serious than intentional, premeditated murder is not to depreciate the seriousness of her actions, or to suggest she should go unpunished. It is but to recognize the difference the Penal Code intends between Murder, a capital offense and the most heinous of crimes, and a situation involving the combination of mental disorder and malice, malice totally unjustified and inexcusable from the viewpoint of a normal person but less culpable than murder for a person emotionally disturbed.

I continue to disagree with the *McClellan* definition of extreme emotional disturbance for the reasons stated in my dissents in *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986); *Dean v. Commonwealth,* Ky., 777 S.W.2d 900 (1989); *Holbrook v. Commonwealth,* Ky., 813 S.W.2d 811 (1991); and *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175 (1994). However, even given the *McClellan* definition of extreme emotional disturbance, to be consistent with *McClellan,* this case should be reversed. In circumstances very similar to the present case, our Court held that, while the evidence of EED was not compelling, McClellan's conviction was reversed because the evidence was sufficient to justify instructing on this mental state. If McClellan was entitled to an instruction on first-degree manslaughter, so is Cecil.

The evidence of the appellant's mental disorder was sufficient to permit a jury finding of "guilty but mentally ill," and the jury so found. Surely the jury should have been permitted to consider the next step: whether

in her demented and enraged mental state she reacted to a sudden, antagonistic confrontation in a manner which qualifies as criminal homicide but less culpable than intentional murder.

The Majority makes much of the evidence from Dr. Noonan that, in his opinion, the appellant would not have killed the victim had there been a policeman at her elbow.[1] While this evidence might be decisive if the question was whether to permit the jury to find the appellant not guilty by reason of insanity, surely it should not prevent an instruction permitting the jury to find EED was a *contributing* factor reducing the degree of the offense from murder to manslaughter.

Here the instructions left the jury with only two alternatives, convict the appellant of murder or turn her loose. No reasonable jury would give the slightest consideration to the latter alternative, although a properly instructed jury, given her emotionally disturbed state, may well have considered her less culpable than an intentional murderer.

This case should be reversed and remanded for a new trial permitting the jury to consider the element of EED and the offense of voluntary manslaughter as well as murder. We should rewrite the instruction on EED propounded in *McClellan* to properly explain its function.

STEPHENS, C.J., and STUMBO, J., join.

---

**1.** I question whether the expert should have been permitted to thus testify as to his opinion of the accused's "actual mental attitude" at the time she pulled the trigger. Does it invade the fact-finding function of the jury? *Dyer v. Commonwealth,* Ky., 816 S.W.2d 647, 652 (1991).