David C. HOLBROOK, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 89–SC–478–MR.

Supreme Court of Kentucky.

June 6, 1991.

As Modified on Denial of Rehearing
Sept. 26, 1991.

Mark A. Posnansky, Appellate Public Advocate, Louisville, for appellant.

Frederic J. Cowan, Atty. Gen., and Carol C. Ullerich, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

Appellant, age twenty-five, was convicted by a jury of the intentional murder of sixty-year-old Lee Watson by shooting him once in the abdomen and seven times in the back with a .22 caliber pump rifle. Holbrook was then sentenced to confinement for a period of forty-five years.

Maston Holbrook, appellant's father, had spent the evening hours of October 26, 1988, sitting in the family room of his trailer home drinking whiskey with his boyhood friend, Lee Watson, while appellant sat watching television. According to appellant, Watson wanted to start a fight with him because Watson believed that his wife was in the house and that appellant was "going to beat on his woman." Thereafter, Watson asked appellant to take him home. Appellant put his arm around Watson and helped him to the front door. At this time, Watson gave appellant a "queer" look and then allegedly stabbed him, inflicting a ¾"

superficial wound to his abdomen. No one saw appellant being stabbed but Maston testified that he saw his son raise his hands in the air and say, "I'm stabbed." June Holbrook, appellant's mother, testified that she ran into the house after hearing shots fired and saw her son holding his hands over the area where he had been cut. She also corroborated her husband's earlier testimony that Watson and her husband were highly intoxicated.

After being stabbed, appellant ran to the bedroom to retrieve his brother's .22 caliber pump rifle. Maston claimed that Watson continued to follow his son, "striking" at him with the knife. With rifle in hand, appellant fired one shot into Watson's abdomen. Watson fell forward onto the floor, striking a door of a chifforobe, causing it to break off its hinge. Holbrook fired seven additional shots into Watson's back, killing him, after allegedly seeing Watson raise himself off the floor with his hands.

The state police and county sheriff were called to investigate the shooting. The police found Watson lying face down in the bedroom next to the doorway holding a lockblade pocketknife in his open right hand. The state police testified that, in their experience, a person falling forward would try to break his fall by using his hands. The rifle was found hidden in the family garden. Tests run on the rifle and the shells indicated that Watson was shot from a distance greater than six to eight feet. The record also indicates that no fingerprints were found on the knife. Maston and June Holbrook were questioned by the state police and both gave a statement.

An autopsy was performed on Watson's body. Dr. John Hunsaker, a forensic pathologist, testified that a bullet entered Watson's abdomen at a slight downward angle and became lodged in his lower spine, and that this injury would have rendered Watson paralyzed from the waist down had he lived. He further stated that seven bullets entered Watson's lower back at a "significant sharp upward direction." A deep gash to Watson's forehead was also

noted by the pathologist in his report to the coroner. A postmortem toxicology report indicated that Watson had a .30 blood alcohol level at the time of his death.

Appellant was indicted and tried for the crime of intentional murder and for the status offense of being a persistent felony offender in the second degree. He testified on his own behalf and admitted that he shot and killed Watson but claimed that he was acting in self-defense and under the influence of extreme emotional disturbance. When questioned as to why he fired the seven additional shots into Watson, Holbrook stated, "I was scared, I didn't want him back on me" and "I was scared of my life because I knowed he had done and already cut me once and if he had got a hold of me again, he would have killed me." He also claimed that he ran to a point in the house where there "was nowhere else to run" before he shot Watson.

Appellant claims primarily two errors on his direct appeal: (1) that the trial court improperly admitted prejudicial character evidence; and (2) that the trial court failed to properly instruct the jury on extreme emotional disturbance and on the defense of self-protection as we have enunciated in *Shannon v. Commonwealth*, Ky., 767 S.W.2d 548 (1989). We address the character issue first.

■ At trial, Maston Holbrook was called by the Commonwealth. Mr. Holbrook was asked by the Commonwealth on direct examination whether the victim had any reason to fear the appellant. His reply was, "No. They was always good buddies as far as I know." The prosecutor then asked Maston whether he had made a statement to the state police on the night of the shooting. Maston admitted that he made a statement but claimed that he could not remember its substance. The prosecutor then sought to impeach Maston by asking whether he had told the police that "... they dread David because they know David will lay the lead to them." Trial counsel made a timely and specific objection to the "lay-the-lead" statement, but it was overruled by the trial court.

Appellant claims that the admission of the statement was improper and prejudicial because the statement went to the character of the defendant at a point in the trial where it had not been placed in issue. The Commonwealth counters this argument by claiming that the statement properly impeached the witness by a prior inconsistent statement.

We agree that the "lay-the-lead" statement was not a proper impeachment of the witness because a portion of the claimed statement went to the bad character of the defendant in revealing to the jury an alleged propensity to shoot people. The rule of evidence in Kentucky is that character evidence cannot be admitted until the defendant has "opened the door," or placed his character in issue, which had not occurred in this case. *See Pruitt v. Commonwealth*, Ky., 487 S.W.2d 940 (1972). We believe that the admission of the "lay-the-lead" statement was error which should not be allowed to occur in the second trial of the defendant.

The next allegation of error occurred during the testimony of June Holbrook. Mrs. Holbrook was asked on cross-examination by the Commonwealth whether she was afraid of her son. She replied, "Yes." No objection was made to this question. On recross-examination, the prosecutor asked whether she had "... good reasons to be afraid of David...." Mrs. Holbrook replied, "Yes, I have," whereupon the prosecutor commented, "I know you do. Thank you." Trial counsel then made a general objection after the extraneous comment by the prosecutor. This was overruled.

■ Counsel for appellant argues that the questions relating to Mrs. Holbrook's fear of her son were improper because they again attacked the defendant's character prior to its being put in issue. The Commonwealth argues on appeal that trial defense counsel failed to properly object to the question and, therefore, the defendant waived any error. In the alternative, the Commonwealth claims that the questions concerning Mrs. Holbrook's fear of her son went directly to her bias in testifying at trial.

We partially agree with the Commonwealth. Appellant failed to object to the prosecutor's questioning regarding Mrs. Holbrook's fear of her son. Furthermore, defense counsel also questioned June Holbrook's fear on redirect examination and revealed that it was unrelated to the current proceedings. Any alleged error was waived by the defendant's failure to object and by his own questioning of Mrs. Holbrook concerning the same subject matter. *Hamilton v. Commonwealth,* Ky., 659 S.W.2d 201, 202 (1983).

But the question by the prosecutor whether she had "... *good reasons* to be afraid of David" was an improper question going to the nature of the appellant's character and inferring some previous incident which had occurred between her and her son. We believe that this question was also error and again state that the question should not be asked by the Commonwealth in the subsequent trial of the defendant.

Appellant next claims that the trial court failed to properly instruct the jury on the defense of self-protection pursuant to our decision in *Shannon v. Commonwealth,* Ky., 767 S.W.2d 548 (1989), and further, that the trial court did not provide the jury with a definition and separate instruction on extreme emotional disturbance.

At the close of proof, trial counsel requested a self-protection instruction pursuant to *Shannon* and a separate instruction and definition on extreme emotional disturbance. The trial court instructed the jury on intentional murder, manslaughter in the first degree, manslaughter in the second degree, and reckless homicide. A self-protection instruction was given as a justification for all four degrees of homicide. Extreme emotional disturbance was included as a negative element of intentional murder but was omitted from the first degree manslaughter instruction. No separate instruction or definition was given on extreme emotional disturbance. Trial counsel specifically objected to the intentional murder instruction and the absence of a separate instruction on extreme emotional disturbance. Appellant's timely objection was overruled.

In *Shannon,* we recognized that an individual may intentionally commit murder while acting under a wanton or reckless belief, and that the actor's subjective belief may be unreasonable when viewed by an objective standard. *Shannon, supra* at 550–51. The jury is required to determine whether the defendant's perception of a need for self-defense, or the degree of force that was used, was reasonable. *See Blake v. Commonwealth,* Ky., 607 S.W.2d 422 (1980). If the jury believes from the evidence that the defendant's claimed need for self-defense is objectively reasonable under the circumstances, then it becomes a complete defense. However, if the justification is not reasonable, then the defendant can only be convicted under *Shannon* of either the offenses of manslaughter in the second degree or reckless homicide, depending upon the jury's determination of the defendant's state of mind at the time of the act. *Shannon, supra* at 112. The logic behind this theory is aptly stated in *Shannon* and will not be repeated here, but the gist of the reasoning is that "[a] subjective belief in the need for self-defense, which is objectively wanton or reckless, is a 'circumstance' falling within the definition of wanton or reckless behavior, punishable under Manslaughter II or Reckless Homicide...." *Id.* at 551–52.

At trial, Holbrook claimed that he initially shot Lee Watson in self-defense, and thereafter, continued to shoot because he was acting under the influence of extreme emotional disturbance. Furthermore, he attempted to show at trial that an altercation had occurred with the deceased prior to the shooting and that he needed to protect himself from Watson. Holbrook's belief in the need to protect himself from Watson, especially considering the degree of force used, could be viewed by a jury as unreasonable. There was a possibility that the jury could have felt that appellant had acted in self-defense, but that his belief in the need for self-defense was wanton or reckless or that his belief that he needed to use the excessive amount of force that he did was wanton or reckless. Therefore,

under *Shannon*, the imperfect justification would require the jury to convict the defendant below on the lesser included offense of manslaughter in the second degree or reckless homicide because of his wanton or reckless state of mind. But the trial court incorrectly gave a self-protection instruction which could have been misunderstood as a complete justification for all four degrees of homicide. We have held that self-protection is not available to a defendant as a defense to wanton murder, manslaughter in the second degree, or reckless homicide. *Id.* at 552. The jury in this case was never afforded a reasonable opportunity to reduce the degree of the offense based upon a subjective belief on the part of the defendant in the need for self–defense. This constituted reversible error.

■ Appellant also claims that a separate instruction and definition on extreme emotional disturbance should have been given to the jury. KRS 507.020 provides that a person shall not be convicted of murder for an intentional homicide which is committed while acting under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse. Extreme emotional distress requires the jury to "place themselves in the actor's position as he believed it to be at the time of the act." *Gall v. Commonwealth*, Ky., 607 S.W.2d 97, 108 (1980). If the jury finds the existence of extreme emotional disturbance, then the offense of murder is reduced to manslaughter in the first degree.

■ Appellant, at trial, admitted that he shot Lee Watson, but claimed that he was acting under extreme emotional disturbance when he fired seven shots into Watson's back with a pump action rifle. Holbrook claims that he was "enraged" by his fear of Watson and the pain he felt from the knife wound. ' The trial court placed the mitigating factor of extreme emotional disturbance as a negative element of the intentional murder instruction but failed to separately define what constituted extreme emotional disturbance. We have held that "[t]he presence or absence of extreme emotional distress is a matter of evidence, and not an element of the crime [of murder]."

*Wellman v. Commonwealth*, Ky., 694 S.W.2d 696, 697 (1985). Thus, if the jury finds that Holbrook committed the intentional act of murder, but finds the existence of extreme emotional disturbance, then the crime must be reduced to manslaughter in the first degree. Under these circumstances, there should have been a separate instruction on extreme emotional disturbance so that the jury could understand how to apply extreme emotional distress to differentiate the two intentional homicide crimes; intentional murder and manslaughter in the first degree.

Appellant also claims that a definition on extreme emotional disturbance must be given in an instruction. We agree. We have held that extreme emotional disturbance is a temporary state of mind which is distinguishable from mental illness, mental disease, and when an individual acts under the influence of alcohol or drugs. *See e.g. Wellman, supra.* These concepts, at times, overlap, especially in the minds of jurors who lack the sophistication and training to understand the differences. Therefore, it is necessary for the proper determination of defendant's guilt or innocence that the jury be instructed on the definition of extreme emotional disturbance. The mental state of extreme emotional disturbance has been defined in our decision in *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464, 468–69 (1986), where we stated:

> Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

Upon retrial the jury must be instructed on the issue of extreme emotional disturbance in accordance with this opinion.

The judgment of the Magoffin Circuit Court is reversed and the case is remanded for further proceedings consistent with this Opinion.

STEPHENS, C.J., and REYNOLDS and WINTERSHEIMER, JJ., concur.

LEIBSON, J., concurs by separate opinion, in which LAMBERT, J., joins.

COMBS, J., dissents without opinion.

LEIBSON, Justice, concurring.

Respectfully, I concur in the Majority Opinion except insofar as it directs the trial court to use at retrial the definition of "extreme emotional disturbance" from *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464, 468–69 (1986). The problem with that definition is that it limits the defense of extreme emotional disturbance to proof that the defendant acted "uncontrollably." As I stated in my Concurring Opinion in *McClellan*:

"The word 'uncontrollably' applies more suitably to the mental state associated with temporary insanity than it applies to the mental state associated with extreme emotional disturbance." *Id.* at 474.

Our murder and manslaughter statutes, as codified in the Kentucky Penal Code, derive from the Model Penal Code of the American Law Institute, adopted at the 1962 Annual Meeting. An extensive discussion of the meaning intended by the ALI Model Code, and by our Kentucky Penal Code, is found in the ALI Model Penal Code and Commentaries, Part II, Section 210.3(5), pp. 53–73 (1980). The reader needs to review these twenty pages to gain a proper understanding of the term "extreme emotional disturbance." To spare the reader I will not try to summarize the discussion in the Commentaries in this Concurring Opinion, nor will I repeat the reasons I stated in *McClellan*. It suffices to say that we are dealing here with a complex concept of diminished criminal responsibility that cuts across the doctrine of provocation, but is much broader than that.

As stated in some prefatory remarks at p. 49 of the ALI Code and Commentaries, *supra*, discussing *"Innovations of the Model Code,"* "the formulation in Subsection (1)(b) [of murder reduced to manslaughter when 'committed under the influence of extreme mental or emotional disturbance'] represents a substantial enlargement of the class of cases which would otherwise be murder but which could be reduced to manslaughter under then existing law because the homicidal act occurred in the 'heat of passion' upon 'adequate provocation.'"

As I stated in *McClellan:*

"The statutory scheme does not require that extreme emotional disturbance be the sole or exclusive cause of the act, as the word 'uncontrollably' seemingly implies." *Id.* at 474.

In my judgment a principled application of the Kentucky Penal Code, in terms of its historical source, requires us to apply the element of "extreme emotional disturbance" as it was intended, as meaning a state of mind justifying a lesser penalty because of a lesser degree of criminal intent. Instead, we have so defined it in *McClellan* that, taken literally, the concept applies only when there is *no* criminal intent. It is now empty of meaning.

LAMBERT, J., joins this concurring opinion.