**Dante Lee McGINNIS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**Richard Wayne TERRY, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Nos. 92–SC–573–MR, 92–SC–659–MR.

Supreme Court of Kentucky.

March 24, 1994.

Motion to Finalize Opinion Granted in 92–SC–659–MR May 27, 1994.*

* Editor's Note: The McGinnis appeal, No. 92–SC– 573–MR, is not yet final.

Daniel T. Goyette, Public Defender, Bruce P. Hackett, Deputy Public Defender, Louisville, for appellant McGinnis.

Chris Gorman, Atty. Gen., E.M. Lowery and Paul D. Gilbert, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

Donna L. Boyce, Asst. Public Advocate, Frankfort, for appellant Terry.

LEIBSON, Justice.

In these separate appeals, both from Jefferson Circuit Court, each appellant has been convicted of wanton murder. In each case the appellant testified at the trial, admitting that he shot the victim, and attempting to justify the killing on grounds it was an act of self-protection. KRS Chapter 507 provides *four* different criminal homicide offenses. In each of the present cases the trial court instructed the jury, separately and alternately, on *five* different possible offenses: intentional murder, wanton murder, first-degree manslaughter, second-degree manslaughter, or reckless homicide. Intentional murder was Instruction No. 1, and included as an element that the accused "was not privileged to act in self-protection" (as elsewhere explained). Wanton murder was set out in Instruction No. 2 as a possible verdict if the jury did "not find the defendant guilty under Instruction No. 1," dropping out the element of self-protection.

Given this set of circumstances, in the *McGinnis* case, by its verdict, the jury first specified the defendant was "not guilty" of intentional murder and then found him guilty of wanton murder "under Instruction No. 2"; and in the *Terry* case the jury disregarded Instruction No. 1 on intentional murder and convicted of wanton murder "under Instruction No. 2."

In each case the appellant claims he was entitled to a directed verdict of acquittal on the wanton murder charge because the only evidence presented was that he shot intentionally in self-defense.[1] In each case the appellant objected both to submitting a wanton murder instruction, as unsupported by any evidence of a wanton act as contrasted with an intentional act, and further objected to the form of the wanton murder instruction, complaining that the trial court compounded the error in instructing on wanton murder by failing to qualify it with instructions on the right of self-protection.

Thus, once again we are confronted with trying to reconcile the various provisions of the 1974 Kentucky Penal Code, found in KRS Chapter 507, "Criminal Homicide," and KRS Chapter 503, "General Principles of Justification." This has come to be commonly known as the *Shannon* problem. *Shannon v. Commonwealth,* Ky., 767 S.W.2d 548 (1988). There are several different facets to the problem, including:

1) Under KRS 507.020, "murder" is but one offense which may be committed in one of two different ways: either by intentionally causing the death of another person, or by wantonly engaging in conduct which "causes the death of another person" "under circumstances manifesting extreme indifference to human life." As explained in the Commentary accompanying the Penal Code, to punish wanton conduct as murder it must be conduct as culpable as intentional murder: "the culpable mental state defined in KRS 501.020 as 'wantonness,' . . . without more, will suffice for a conviction of manslaughter in the second degree" but *not* for murder because, to qualify as "murder," "a *capital* offense," it must be "accompanied" by further "circumstances manifesting extreme indifference to human life." Commentary to the Penal Code, KRS 507.020.[2] The Commentary to KRS 507.020 explains that this structure derives from the *Model Penal Code* of the *American Law Institute.* To qualify as "circumstances manifesting extreme indifference to human life," a "culpable mental state" equivalent to intentional murder, wanton killing must exhibit "purposeful or knowing" indifference, "conduct evidencing a 'depraved heart' with no regard for human life." American Law Institute, *Model Penal Code and Commentaries,* 1980 ed., Part II, Sec. 210.2. Murderous intent is as much a component of wanton murder as it is of intentional murder. It is an equally culpable mental state differing in that, while the consequences of the act are equally foreseeable, the actor is indifferent to who is/are the

---

**1.** McGinnis further claims he was shooting to protect "a friend, Reginald Stroud," who "was being kicked as he lay on the ground" nearby.

**2.** This is "based on the Commentary which accompanied the final draft of the Penal Code in

1971, published by the Kentucky Crime Commission and the Legislative Research Commission." Banks–Baldwin, *Criminal Law of Kentucky Annotated,* p. 633 (1992–93). As such it provides the legislative history for the Penal Code.

victim(s). The first question raised by the *Shannon* problem is whether wanton murder is a viable concept when proof of wantonness derives from an act committed in self-defense which is wanton in nature.

2) In Kentucky we have long recognized as fundamental that when the accused has " 'admitted the shooting' and then 'attempted to justify it on the grounds of self-protection' ... 'there is no evidence that his actions were anything other than intentional'; ... that 'we cannot escape the fact that an act claimed to be done in self-defense is an intentional act.' " *Shannon, supra* at 548–49, quoting from *Gray v. Commonwealth*, Ky., 695 S.W.2d 860, 861 (1985) and *Baker v. Commonwealth*, Ky., 677 S.W.2d 876, 879 (1984), (overruled in *Shannon* on other grounds). The second question raised by the *Shannon* problem is whether one can reconcile the intentional character of an act done in self-defense with wanton murder as defined in KRS 501.020.

Before the Kentucky Penal Code was enacted, the threshold for recognizing an act of self-protection as a defense was proof it was "objectively reasonable" to believe in the need for self-defense. The Penal Code has changed this to one of "subjective belief." *See* KRS 503.050 and *Commentary.* However, KRS 503.120(1) then qualifies an act of self-protection as a defense by specifying it is *"unavailable* in a prosecution for an offense for which wantonness or recklessness, as the case may be, suffices to establish culpability." (Emphasis added.) The question presented is whether the intentional nature of an act done in self-defense and the culpable mental state in the crime of wanton murder are irreconcilable concepts.

3) One further complication to this problem occurs when the defendant who claims he acted in self-defense further claims that he *didn't mean* (intend, or want) to kill the victim at the time he fired the fatal shot in his direction or struck the fatal blow. The question is the impact of testimony to this effect on the instructions.

In *Shannon v. Commonwealth, supra,* this Court attempted to write a definitive opinion on these problems. In the *Shannon* case the court concluded trial judges should not instruct on wanton murder where the claim is self-defense because: (1) if this claim is *not* believed, the accused's intention in firing the fatal shot or striking the fatal blow fits only the definition of "intentionally" in KRS 501.-020(1); (2) on the other hand, if this claim of self-defense is believed, but the jury further believes the defendant wantonly or recklessly perceived a need for self-protection or deadly force where none existed, the level of culpability needed for wanton murder is missing and under KRS 503.120 the act should be punished only as Manslaughter II or Reckless Homicide. As *Shannon* states, the situation then presented is "less culpable than murder"; it is Manslaughter II or Reckless Homicide "depending on whether the belief was wantonly or recklessly formed." *Id.* at 551.

The *unintended* result of the *Shannon* opinion has been to create a class of cases wherein, because the accused claims self-defense, trial courts have been instructing on wanton murder while disregarding the fact that diminished culpability is a necessary corollary to a "wanton or reckless belief" in the need for self-defense. The wanton murder instruction without self-defense which follows from this error provides an easy avenue for erroneous conviction on a charge of wanton murder.

The primary reason *Shannon* has been misapplied is because *Shannon* ended up affirming a wanton murder conviction. However, *Shannon* was affirmed *only* because of procedural default unrelated to the principles explained in the body of the opinion. We affirmed because Shannon "did not move for a directed verdict on the charge of wanton murder, nor did he object to an instruction on this offense. Indeed, he requested such an instruction ... [arguing] only that the wanton murder instruction should include self-defense as a justification." *Shannon, supra* at 549. We held "[w]e would not reverse this case to order such self-contradictory instructions." *Id.* at 552. Proof Shannon was guilty of murder (albeit intentional rather than wanton) was overwhelming. We held in *Shannon* that the error was harmless and unpreserved.

But the purpose of *Shannon* was to *prevent* giving an instruction on wanton murder in cases of this nature, *not* to authorize giving such an instruction, and, even worse, to authorize giving one that invites conviction by omitting the accused's only line of defense. In our latest case on the subject, *Sizemore v. Commonwealth*, Ky., 844 S.W.2d 397 (1992), dissenting Justice Dan Jack Combs stated: "*Shannon* is fraught with self-contradiction." *Id.* at 401. The contradiction comes not from the principles of law explained in *Shannon*, but from misunderstanding the reason why the wanton murder conviction was affirmed. As we discuss the two cases now presented, we will seek to further unravel the confusion generated by the *Shannon* case.

## I. McGINNIS v. COMMONWEALTH

Dante Lee McGinnis was convicted on two charges, wanton murder and first-degree wanton endangerment, following a shooting incident about 3:30 a.m. on February 8, 1990. He was sentenced to 40 years imprisonment on the charge of wanton murder and one year for wanton endangerment, to run concurrently.

McGinnis was 19 years old. He and many others were congregated in the parking lot of a White Castle restaurant at Seventh and Broadway in downtown Louisville, Kentucky. McGinnis was with friends, including Reginald Stroud and Blair Kidwell. He became involved in a bottle-throwing incident and a fist fight with one Eric Rufus, who can fairly be described as a member of a hostile gang, and a number of Rufus' confederates. While the men traded insults and fought, Kidwell ran to McGinnis' car and drove it around the corner, parking it in front of the Bank of Louisville at 626 West Broadway, with motor running. McGinnis and Stroud, chased by Rufus and others, and followed by a crowd of onlookers, ran from the parking lot to the bank. McGinnis went to the car, got a big silver revolver he had bought recently as the trouble escalated between these opposing gangs, and fired it into the ground. His friend Stroud then attempted to take the gun away, but McGinnis grabbed it back, accidentally shooting Stroud in the leg in the process.

In spite of the weapon, Rufus continued to advance, threatening violence. McGinnis shot at Rufus' legs without hitting him, and threatened to kill him. Suddenly one of Rufus' confederates, Antonio Miller, ran up from behind McGinnis and hit him in the side of his face. McGinnis stumbled, turned around, and shot Miller full in the chest, killing him. McGinnis then fled the scene in a car with Kidwell and two others, disposing of the gun in the process. Only McGinnis was armed in this conflict.

McGinnis' defense to killing Antonio Miller was: (1) that he carried the gun because he was in fear of his life; (2) that he shot Miller to protect himself and his friend, Stroud, whom Miller had kicked after Stroud fell to the sidewalk upon being accidentally shot by McGinnis; and (3) that he "did not mean for it to happen." It should be noted that, while McGinnis testified that he carried the weapon with him in the glove box of his car because he believed his life was in danger from members of this hostile gang, McGinnis admitted throwing the bottle at Rufus to hit him in the head, and admitted that this was the first blow thrown.

The jury acquitted McGinnis of the second-degree assault charge in connection with accidentally shooting his friend, Reginald Stroud, and found him guilty of the first-degree wanton endangerment charge based on shooting at the feet of Eric Rufus. As previously stated, they also acquitted McGinnis of the intentional murder charge under Instruction No. 1, but convicted him of wanton murder under Instruction No. 2.

McGinnis raised six issues on appeal, one of which concerns whether the jury should have been instructed on wanton murder, and, if so, how instructed (the *Shannon* problem, which we have discussed and will discuss further later in this opinion). The remaining five issues do not merit reversal. They are as follows:

■ First, appellant, a black man, contends the prosecutor used peremptory challenges to eliminate blacks from the jury.

The prosecutor struck three of the six black people remaining in the final draw.

Defense counsel objected to the strikes as racially motivated in violation of the United States Supreme Court holding in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor explained two of the jurors had previously sat on a jury which returned a reckless homicide verdict, which he considered pro-defense under the particular circumstances. The third appeared confused as to whether she had sat on a criminal or a civil case during prior jury service, and the prosecutor was wary of her answers. The trial judge found the reckless homicide verdict was an appropriate and racially-neutral explanation for eliminating two of the jurors but found the third strike "questionable." However, the trial judge stated he was comfortable with the jury and chose not to set aside the panel.

In *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the United States Supreme Court, demonstrating great deference to the trial court, used a "clearly erroneous" standard to review a trial court finding of no discriminatory intent in the exercise of peremptories. We have since chosen to follow *Hernandez*. *See Commonwealth v. Snodgrass*, Ky., 831 S.W.2d 176 (1992). In the present case, the trial court's finding was not clearly erroneous, and there was no abuse of discretion.

Second, appellant maintains that in light of the overwhelming evidence of self-protection the court improperly denied his motion for a directed verdict of acquittal on the murder charges, both intentional and wanton. He was entitled to a directed verdict on the wanton murder charge because the only evidence was that he shot intentionally. The evidence in this case, however, was not conclusive on the issue of self-protection, so the appellant was not entitled to a directed verdict on the intentional murder charge. As appellant was the only one armed, it would not have been unreasonable for the jury to find appellant did not act in self-defense or that in doing so he used deadly force when he did not believe such force was necessary to protect himself (or another). KRS 503.050 and .070.

In any case, we need not even reach the question of whether there was sufficient evidence to convict appellant of intentional murder, because the jury found him *not guilty* of intentional murder. Appellant was convicted of wanton murder. Therefore the appellant suffered no prejudice from the trial court failing to direct a verdict on the intentional murder charge.

Third, appellant contends it was error not to include a definition of extreme emotional disturbance in the instructions.

The intentional murder instruction given to the jury included extreme emotional disturbance as a negative element stating:

> "You will find the defendant, Dante Lee McGinnis, guilty under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> (a) [That he shot and killed Antonio Miller].
>
> (b) That in so doing, he caused the death of Antonio Miller intentionally and not while acting under the influence of extreme emotional disturbance."

Appellant correctly argues that where the evidence warrants the inclusion of extreme emotional disturbance as a mitigating factor to murder, the trial court should separately instruct on extreme emotional disturbance "so that the jury [can] understand how to apply extreme emotional distress to differentiate the two intentional homicide crimes; intentional murder and manslaughter in the first degree." *Holbrook v. Commonwealth*, Ky., 813 S.W.2d 811, 815 (1991).

We need not decide whether the absence of such a separate instruction should constitute reversible error in this case, however, for two reasons: (1) appellant failed to specifically object to the failure to give this instruction, as required by RCr 9.54(2), nor did he tender his own, and the issue is therefore unpreserved; and (2) appellant was convicted of wanton murder and therefore suffered no prejudice from any potential error in the instruction on intentional murder.

Fourth, appellant argues it was error to limit the self-protection instruction with

provocation and initial aggressor qualifications. KRS 503.060(2) and (3). Appellant concedes he threw a Coke bottle at Rufus earlier, back at the White Castle, but states there was no evidence presented at trial that he provoked or was the initial aggressor in the use of force against the victim, Miller. Again, this is an issue we need not decide because the appellant was convicted of wanton murder, and self-protection is not a defense to criminal homicide where wantonness or recklessness constitutes the culpable mental state. *See* KRS 503.050 and .120, and Commentary.

■ Finally, appellant argues it was error to admit evidence of prior misdemeanor convictions during the sentencing phase where the evidence did not adequately reflect knowing and intelligent guilty pleas. Evidence of a concealed weapon conviction and a possession of a stolen credit card conviction was introduced by the Commonwealth during the sentencing phase of trial. Appellant had pled guilty to both counts.

Appellant contends that, as no transcripts of the guilty plea hearings were presented, the Commonwealth had the burden of proving appellant's guilty pleas were constitutionally valid.

Appellant applies the wrong standard. The United States Supreme Court in *Parke v. Raley*, 506 U.S. ——, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992), upheld our own Kentucky procedure for using evidence of judgments of conviction on prior guilty pleas in the penalty phase as set out in *Dunn v. Commonwealth*, Ky., 703 S.W.2d 874 (1985). While *Dunn* involved proof of a prior conviction in a persistent felony proceeding, there is no reason for a different rule in a truth-in-sentencing proceeding. Under Kentucky law, once the Commonwealth has proved the existence of a conviction entered on a guilty plea, the burden shifts to the defendant to introduce evidence of its invalidity. In the present case, appellant offered no evidence that the pleas were involuntary. The trial court properly allowed the Commonwealth to introduce evidence of the prior misdemeanors.

■ Turning now to the *Shannon* issues, here, in addition to seeking a directed verdict on the charge of wanton murder, the defense specifically objected to the giving of a wanton murder instruction, and the defense included a wanton murder instruction in the set of instructions submitted on behalf of McGinnis only after its objection was overruled. In doing so the defense noted in the record that the instruction was not a waiver of the previous objection. As we have discussed *supra*, the various provisions of the Penal Code, construed as a whole, do not justify submitting the case on a wanton murder instruction where the issue is self-defense, as in this case.

The appellant claims to have shot reluctantly in self-defense. This is yet another case wherein "the defendant killed with a lethal weapon in self-defense, but also claimed that he did not mean to kill." *Sizemore, supra* at 407, Leibson, J., dissenting. One of the problems with *Shannon*, perhaps, is that it did not sufficiently address the problem that arises where, in claiming self-defense, the defendant also denies meaning to kill the victim. An intentional murder instruction requires a jury finding of "intent to cause the death of another person." KRS 507.020(1). McGinnis stated he did not "mean" to kill the victim. Intent may be inferred from consequences, notwithstanding a disclaimer. As the Commentary to KRS 501.020 explains in the process of defining the various culpable mental states, "homicide" and "assault" are "result" offenses. Regardless of whether the accused "means" to kill, knowing the conduct is of a nature to cause the result suffices to prove "intentionally": "For offenses of this type ['homicide' and 'assault'] the distinction between 'intentionally' and 'knowingly' is practically nonexistent[.]" Commentary to KRS 501.020. *Shannon* holds that when one deliberately commits a lethal act, the claim that he did not mean to kill is part of the self-defense claim, but it does not change the character of intentional murder to wanton murder.

If the defendant presents testimony sufficient to persuade a jury that the defendant intended to shoot, but not to cause the result, the criminal homicide statutes provide a

menu adequate to address the diminished culpability issue raised by such testimony.

■ First of all, the jury should be instructed on voluntary manslaughter, which sufficiently covers the situation where one shoots "with intent to cause serious physical injury to another person," but causes death. KRS 507.030(1)(a). This instruction would apply where the jury does not believe the claim of self-defense, but further concludes the defendant did not intend to kill. This instruction, of course, should be qualified by a self-defense instruction with Manslaughter II and Reckless Homicide as options available if the jury concludes there was an act of self-defense, wanton or reckless in character.

■ Next, assuming the jury believes the defendant did not even intend serious physical injury, i.e., that he intended slight injury or no injury, surely any shooting in the direction of the victim which cannot be justified as reasonable qualifies as "wantonly caus[ing] the death of another person" (Manslaughter II, KRS 507.040(1)) or "with recklessness [causing] the death of another person" (Reckless Homicide, KRS 507.050(1)). The offenses described under Manslaughter II and Reckless Homicide are sufficient to cover both a jury finding of a subjective belief in the need for self-defense which was objectively unreasonable (wanton or reckless) and a jury finding that, while there was no act of self-defense, there was no intent to kill or seriously injure. Intentionally shooting a lethal weapon at another human being, even if the intent is only to scare the victim, qualifies as Manslaughter II or Reckless Homicide if the consequence is to kill the victim. The effect of evidence that the accused did not mean to cause the death of the victim, *if believed*, is to establish diminished culpability, not to establish wanton murder. He cannot be convicted on evidence of this nature of wanton murder because, although the element of wantonness is presented, the element of extreme indifference to human life is not.

The degree of culpability required for a finding of wanton murder was not sufficiently addressed in *Barbour v. Commonwealth,* Ky., 824 S.W.2d 861 (1992) and *Sizemore v. Commonwealth,* Ky., 844 S.W.2d 397 (1992).

As stated by Justice Dan Jack Combs in his dissenting opinion in *Sizemore:*

"[W]antonness *suffices* to establish culpability for manslaughter in the second degree, but it *does not suffice* to establish culpability for wanton murder, which requires the additional state-of-mind element of manifest extreme indifference to human life ['the actor's conscious disregard of the risk']." [Emphasis original.] Citing Model Penal Code § 210.2, comment, p. 21 (Am.Law Inst.1980).

. . . .

As the statutes reveal, the General Assembly intends that a defendant who has used deadly force in the [subjective, erroneous] belief that such force was necessary to protect himself against death or serious physical injury is not guilty of wanton murder. The rationale for this legislative decision is similarly plain: where the actor believes in the need to protect his life, the circumstances, while they may demonstrate wantonness, *cannot* manifest extreme indifference to human life." 844 S.W.2d at 403. (Emphasis original.)

As summarized in *Holbrook v. Commonwealth,* Ky., 813 S.W.2d 811, 814 (1991):

"In *Shannon,* we recognized that an individual may intentionally commit murder while acting under a wanton or reckless belief, and that the actor's subjective belief may be unreasonable when viewed by an objective standard. *Shannon, supra* at 550–51. . . . If the jury believes from the evidence that the defendant's claimed need for self-defense is objectively reasonable under the circumstances, then it becomes a complete defense. However, if the justification is not reasonable, then the defendant can only be convicted under *Shannon* of either the offenses of manslaughter in the second degree or reckless homicide, depending upon the jury's determination of the defendant's state of mind at the time of the act. *Shannon, supra* at 552. . . . [T]he gist of the reasoning is that '[a] subjective belief in the need for self-defense, which is objectively wanton or reckless, is a 'circumstance' falling within the definition of wanton or reckless behavior,

punishable under Manslaughter II or Reckless Homicide....' *Id.* at 551–52." Thus, to the extent that *Barbour v. Commonwealth, supra,* and *Sizemore v. Commonwealth, supra,* have misinterpreted the opinion in *Shannon,* they are overruled.

The bench and bar have engaged in extensive debate regarding whether it is appropriate to include self-defense as an element of the instructions when the defendant is charged with a wanton or reckless homicide. *See* Cooper and Lawson, *Self–Defense in Kentucky: A Need for Clarification or Revision,* 76 Ky.L.J. 167 (1987–88). But the *Shannon* opinion plainly states that self-defense is no defense where the culpable mental state is either wanton or reckless (citing KRS 503.120). By the same token, wanton murder is no option in the self-defense scenario.

■ The instructions in the McGinnis case directed the jury to consider Wanton Murder "If you do not find the defendant guilty under Instruction No. 1 (on Intentional Murder)." Wanton Murder is not, of course, a lesser included offense of Intentional Murder, simply dropping out the element of self-defense, as it would so appear from these instructions.

The *Commentary* to the Penal Code ties together the relationship between self-defense as described in KRS 503.050 and the diminished culpability in KRS 503.120 as follows:

"... if a defendant, in killing another, believes himself in danger of death but is wanton in having such a belief, *he cannot be convicted of murder*[3]. But since manslaughter in the second degree is committed through 'wantonness' and since this subsection denies a defendant justification for such an offense, he can be convicted of this lesser degree of homicide." Commentary to KRS 503.120. (Emphasis added.)

Here the prosecutor argued in effect, repeatedly, that self-defense was not available on the charge of wanton murder, so forget his self-defense claim—the accused had convicted himself of wanton murder out of his own mouth. A wanton murder conviction followed as a matter of course, as we have seen in a number of appeals based on this scenario. In structuring four degrees of criminal homicide based on the degree of culpability, the Penal Code intended no such result. The various provisions in KRS Chapter 503 on justification establish differences in criminal homicide and assault depending on the culpable mental state. The instructions in *McGinnis* should not have included wanton murder as an available option.

## II. TERRY v. COMMONWEALTH

Richard Wayne Terry, age 31, was convicted of wanton murder in the slaying of his brother-in-law, Abraham King, and was sentenced to 45 years imprisonment.

King was married to Terry's sister, Elvinia. Terry and others in the family believed Elvinia had died under circumstances suggesting that King was responsible.

The shooting occurred in the home of Elvinia's mother. She was in her back bedroom pondering Elvinia's funeral arrangements when her son-in-law, King, arrived with some of his own relatives. King proceeded to the back bedroom, presumably to console his mother-in-law.

Into this situation, loaded with the potential for violence, Terry arrived and proceeded immediately to the back bedroom. Within seconds, the shooting occurred. King was shot at close range through the back of the head and through the neck. Terry then hastily departed, taking his own relatives with him, and, after having proceeded some distance from the scene, threw the weapon that fired the fatal shots out of his car window and proceeded straight away back to his home in Tennessee.

Terry testified in his own defense. He denied that the weapon involved was his own gun, claiming that as soon as he entered his mother-in-law's bedroom King was ripe to quarrel, and pulled out the gun. According to Terry, he grabbed King's hands and the gun went off, firing through the window; King let the gun go into Terry's hands and Terry then shot King, and then shot him

---

**3.** There is only one "murder offense" and it includes both intentional and wanton murder.

again. There was no struggle. He shot King because King pulled a gun on him.

Terry testified he didn't know what his intent was when he shot King, other than "he was scared." He testified he waited around awhile after the shooting, rather than making a hasty exit as others described, and that his reason for leaving was because he did not want to have to shoot any of King's brothers.

In the *Terry* case, as in the *McGinnis* case previously discussed, the principal issues on appeal were denying a motion for a directed verdict of acquittal on the charge of wanton murder and refusing to include the defense of self-protection in the wanton murder instruction. As in *McGinnis,* the wanton murder instruction was given as a separate instruction for the jury to consider if they did not convict King of intentional murder under "Instruction No. 1," thus seemingly relegating it to the erroneous status of a lesser included offense.

Terry's two remaining claims of error, which we will discuss first, are (1) a *Doyle* violation (*Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)), which is a claim the prosecutor commented in a constitutionally impermissible manner on the accused's pretrial exercise of his right to remain silent; and (2) permitting the prosecutor to prove conviction of a felony for purposes of impeachment when the felony conviction was eleven years old.

We turn first to the claim of a *Doyle* violation. *Doyle* pertains to evidence and comment on *post-arrest* silence, not to evidence that may fairly be classified as proof of a guilty state of mind tending to disprove the appellant's claim of innocence by reason of self-defense. As stated in *Fugate v. Commonwealth,* Ky., 445 S.W.2d 675, 681 (1969):

> "[F]light and attempts at concealment are circumstantial evidence of guilt, because they suggest a guilty state of mind...." (Citations omitted.)

The premise underlying *Doyle* does not disclaim flight or silence as admissible evidence in circumstances where the trier of fact could reasonably infer an innocent person would stay to provide an explanation. *Doyle* holds only that, because *"Miranda* warnings" are now part of due process (*Miranda* requires informing "a person under arrest" "that he may remain silent, [and] that anything he says may be used against him"), notwithstanding the inference that might otherwise be drawn from his silence, to comment on "silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. at 2245.

The holding in *Doyle* does not apply here. The questions and answers underlying the present claim that prejudicial error occurred on Terry's cross-examination were as follows:

Q. You didn't wait for the police to arrive to tell them the supposed story that Abraham had a gun, correct.

A. No, mam.

Q. In fact, today is the first time you're telling this story, correct?

A. No, mam.

Q. You have never reported to the authorities, to the police authorities that Abraham had a gun.

Defense Counsel: Objection.

Judge: (At bench) State your basis.

Defense Counsel: It's an indirect reference on his 5th Amendment privilege not to incriminate himself. It's compulsory testimony. It's not only indirect, it's direct because he hasn't made a statement to the police. He has no, in fact he has a constitutional right not to make a statement.

Judge: He's on the witness stand at the present time, Mr. McCall.

Prosecutor: Thank you.

Defense Counsel: Judge, as I understand it ...

Judge: Believe me, he can be asked that question, if he ever made a statement to the police.

Q. You never, ever, told the authorities that Abraham King came at you with a gun, correct?

Defense Counsel: Judge, same objection.

Prosecutor: Your honor, in fact, I'll just strike the question."

Only the first two questions were answered, and they relate to establishing an inference that the appellant had a guilty state of mind because he fled rather than choosing to remain to tell his story. The first question related solely to pre-arrest silence to which *Doyle* does not apply. The second question was whether "today is the first time you're telling this story," which may or may not refer to post-arrest silence, but Terry answered *"No"* to this question.

The remaining two questions, which were the only ones to which objections were made, were never answered. When the objection was first made and overruled, the prosecutor then restated the question and, when defense counsel objected again, the prosecutor withdrew the question. It is meaningless to argue over whether *Doyle v. Ohio* should be stretched to cover evidence that Terry "never, ever, told the authorities that Abraham King came at [him] with a gun" when no such evidence was presented because the prosecutor withdrew the question.

The prosecutor's first question to Terry on cross-examination was whether he had ever been convicted of a felony, and Terry replied that he had been so convicted at age 19. The court then admonished the jury, advising that such evidence goes only to considering the credibility of the witness. Defense counsel had objected to this evidence on grounds the prior conviction was too old to be relevant, citing the newly enacted KRE 609 which had been published with an effective date one week *after* this trial. KRE 609 specifies evidence of conviction of a crime shall be admissible for impeachment "if the crime was punishable by death or imprisonment for one (1) year or more under the law under which the witness was convicted." The rule further provides in subsection (b):

"**Time limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten (10) years has elapsed since the date of the conviction unless the court determines that the probative value of the conviction substantially outweighs its prejudicial effect."

Even before the time limit suggested by the new rule, whether to consider proof of a prior felony conviction too remote to be of probative value rested within the "sound discretion" of the trial court. *See Commonwealth v. Richardson,* Ky., 674 S.W.2d 515 (1984). Here the trial court was ruling in an area where he had discretion. A rule that would become effective at a later date hardly served to divest him of discretion.

The Kentucky rule on the admissibility of evidence of a conviction of a crime for impeachment (KRE 609) differs in several respects from the federal rule (FRE 609). Without regard to how the federal rule may be interpreted, KRE 609 does not, by its terms, divest the trial court of a limited discretion to admit a conviction more than ten years old. It is precatory, rather than mandatory, and leaves room for a trial judge to rule such evidence admissible in circumstances where fairness so demands.

In this case, the trial judge was within his discretion in admitting the evidence under the rule in effect at the time of trial. In the event of a new trial, if the evidence is offered again, the trial judge will be bound by the procedure specified in KRE 609. However, KRE 609 does not foreclose the evidence; it simply imposes on the Commonwealth the burden of persuading the court that, in the circumstances in which the evidence is being offered, "the probative value of the conviction substantially outweighs its prejudicial effect." KRE 609, *supra.*

We turn now to the wanton murder/self-defense problem, the *Shannon* issues. Here Terry, as did McGinnis, sufficiently preserved his right to a directed verdict on the charge of wanton murder and his objection to the instruction on wanton murder. Terry shot King through the back of the head and the neck, at close range. The act was intentional and the only possible consequence of this act was to cause death. Yet, possibly the jury could believe from Terry's testimony, despite the evidence to the contrary, Terry's claim of self-defense.

Under the structure of the Penal Code, if Terry believed it was necessary to shoot in self-defense, however wanton or unreasonable his belief was in the circumstances, his degree of culpability was less than that required to convict him of murder. Such a

belief, if truly held, diminished his culpability to Manslaughter II or Reckless Homicide. The instructions on Manslaughter II and Reckless Homicide should not be qualified by self-defense because self-defense is "unavailable in a prosecution for an offense for which wantonness or recklessness ... establish[es] culpability." KRS 503.120(1). By the same token, if the jury believes Terry's belief in the need for self-defense was objectively reasonable, he did not commit a wanton or reckless act. Manslaughter II and Reckless Homicide instructions will also suffice to cover the situation if the jury does not believe the claim of self-defense, but is persuaded Terry intended no injury, or slight injury, because it is, at the least, wanton or reckless to fire a deadly weapon at another person, regardless of the degree of harm intended.

An instruction on Manslaughter I, qualified by a self-defense instruction, is also proper in present circumstances. This finding is possible because the jury might possibly conclude from Terry's testimony that, while he lacked the intent to cause death requisite to a finding of intentional murder, he intended serious physical injury. Should they so conclude, and further conclude that Terry was not acting in self-defense, Manslaughter I is the appropriate conviction. KRS 507.030(1). Likewise, Manslaughter I is the appropriate verdict should the jury conclude Terry shot to kill while acting under the influence of extreme emotional disturbance. KRS 507.030(2).

Wanton murder is not an available option under the evidence presented.

### III. CONCLUSION

For the reasons stated, we reverse the convictions of both Dante Lee McGinnis and Richard Wayne Terry, and in each case remand to the trial court for further proceedings consistent with this opinion.

This opinion is an interpretation of substantive law, and as such it has only prospective application. It applies only to those cases not final where the issue is preserved.

STEPHENS, C.J., and LAMBERT, LEIBSON and STUMBO, JJ., concur.

SPAIN, J., dissents by separate opinion in which REYNOLDS and WINTERSHEIMER, JJ., join.

WINTERSHEIMER, J., dissents by separate opinion in which REYNOLDS and SPAIN, JJ., join.

SPAIN, Justice, dissenting.

Respectfully, I dissent from so much of the Majority's decision as reverses and remands each of these convictions for the offense of wanton murder. Under the peculiar circumstances of each of these cases, as well as those in *Barbour v. Commonwealth,* Ky., 824 S.W.2d 861 (1992), and *Sizemore v. Commonwealth,* Ky., 844 S.W.2d 397 (1992), (neither of which should be overruled), the trial court was completely justified in instructing the jury on the offense of wanton murder as well as on the offense of intentional murder. This is so because there was evidence in the record which would support a conviction under either hypothesis. *Commonwealth v. Duke,* Ky., 750 S.W.2d 432 (1988), and *Carsons v. Commonwealth,* 243 Ky. 1, 47 S.W.2d 997 (1931). *Lester v. Commonwealth,* Ky., 239 Ky. 703, 40 S.W.2d 306 (1931).

The Majority criticizes and overrules our very recent decisions in the *Barbour* and *Sizemore* cases, commenting that they did not sufficiently address the degree of culpability required for a finding of wanton murder. While it is true that the phrase, "circumstances manifesting extreme indifference to human life," is not quoted in *Sizemore,* our opinion there correctly equates the conduct of the defendant to this degree of culpability in describing his actions toward his brother, whom he killed, as follows:

> [H]e shot a pistol out of the hand of the victim and ... while the victim was trying to pick the pistol up with his other hand, he turned his head and fired several times in the direction of the victim.

*Sizemore* at p. 399.

In *Barbour,* on the other hand, the description of the degree of culpability required for wanton murder is repeated three times in the two paragraphs discussing the issue at page 864:

[F]rom this evidence the jury could have reasonably believed from appellant's testimony that by sticking the victim, Palmer, he did not intend to kill him, but that his conduct disclosed *a mental state of wantonness manifesting an extreme indifference to human life.* It is also reasonable to infer from the act of sticking the victim in the chest that appellant intended to kill him, but it is just as reasonable to infer (as appellant testified) that he did not intend to cause the victim's death. Such inference is factually supported by appellant's testimony that when he withdrew the knife from his pocket, that he did so only to scare Palmer. We reason, based upon this record, that a juror could have reasonably found that appellant's conduct was *so wanton as to manifest an extreme indifference to human life. Nichols v. Commonwealth,* Ky., 657 S.W.2d 932 (1983). The trial court did not err by instructing the jury on wanton murder.... Thus, under the instructions as given, and before a jury could convict appellant of wanton murder, it was necessary to find Barbour not only guilty of wanton murder, i.e. that he engaged in wanton conduct which caused the death of the victim *under circumstances manifesting extreme indifference to human life,* but additionally that appellant was not privileged to act in self-protection. (Emphasis added.)

I would also observe that the opinion of the Majority, in its scholarly dissertation of all the precise niceties of theoretical criminal law, engages in a high degree of "Monday morning quarterbacking." It is one thing for us "ivory tower" appellate judges to apply twenty-twenty hindsight to what a trial judge should or should not have instructed upon, and quite another to anticipate what a panel of judicial experts will find erroneous this season. Furthermore, the Majority, I fear, has temporarily lost sight of the exclusive fact-finding function of the jury in these criminal cases. It is they, not we, who have the final word as to whether particular wanton acts do or do not reach the degree described by the scholars as "circumstances manifesting extreme indifference to human life." I, too, would quote from the comments to the Model Penal Code, upon which so much of the rationale of the Majority depends:

[T]here is a kind of [wanton] homicide that cannot fairly be distinguished ... from homicides committed [intentionally]. [Wantonness] ... presupposes an awareness of the creation of substantial homicidal risk, a risk too great to be deemed justifiable by any valid purpose that the actor's conduct serves. Since risk, however, is a matter of degree and the motives for risk creation may be infinite in variation, some formula is needed to identify the case where [wantonness] should be assimilated to [intention]. The conception that the draft employs is that of extreme indifference to the value of human life. The significance of [intention] is that, cases of provocation apart, it demonstrates precisely such indifference. *Whether [wantonness] is so extreme that it demonstrates similar indifference is not a question that, in our view, can be further clarified; it must be left directly to the trier of the facts.* If [wantonness] exists but is not so extreme, the homicide is manslaughter.... Model Penal Code, § 201.2, Comment 2 (Tent.Draft No. 9, 1959). (Emphasis added.)

In view of the above, I would not disturb the jury's verdicts in these cases, nor would I fault the trial judges for including instructions on wanton as well as intentional murder in these cases. While I do appreciate the Majority's valiant effort to unscramble the eggs served in *Shannon v. Commonwealth,* Ky., 767 S.W.2d 548 (1988), it appears to me that, alas, we will continue to meander and float "where the River *Shannon* flows."

REYNOLDS and WINTERSHEIMER, JJ., concur in this dissenting opinion.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because the jury was well within its right and duty to find that the wanton behavior of McGinnis amounted to extreme indifference to human life sufficient to convict him of wanton murder. The effort of the majority to fashion some kind of rule based on this case is without any merit. The so-

called *Shannon* problem is not solved in any respect.

The majority opinion states that "self-protection is not a defense to criminal homicide where wantonness or recklessness constitutes the culpable mental state." This is essentially the same language which created the original so-called *Shannon* problem. The holding in *Shannon* is perfectly sound. As in this case, the real problem arises in the extended discussion indulged in by the majority opinion.

The fatal flaw in the logic of the interpretation and academic comment of the majority opinion is that it overlooks the fact that it is a jury, and not this Supreme Court, that properly decides whether particular conduct evidences "extreme indifference to human life."

As noted in the dissent by Justice Spain, in which I fully concur, this opinion continues to proliferate the confusion which trial judges face on a regular basis. This Court can have an impact on the common law of Kentucky, but this opinion cannot alter the clear language of the statute, nor does it even attempt to challenge that language.

There may well be good reason for concern as to whether a self-defense instruction could be given for wanton murder. Such concern should be directly addressed to the General Assembly so that the statute in question might be revised in some manner.

The majority opinion indicates, and correctly so, that the only difference between second-degree manslaughter and wanton murder is that wanton murder adds the element that the defendant must have acted "with extreme indifference to human life." McGinnis claims not to have wanted to kill the victim, yet during a street brawl, where he was the only person armed with a gun, he spun around and discharged the gun at point blank range into the victim's chest. Terry claims he wrestled the gun out of the victim's hands before shooting him in the neck and the back of the head. I see no reason to reverse the decision of the jury.

I also believe it should be noted that the majority opinion seems to elevate remarks made in the commentary into the precedential law of this Commonwealth. I believe

this is unwarranted and unnecessary. I believe it creates a kind of legislative function in a judicial opinion.

The *Criminal Law of Kentucky* states on page ii that its contents are "Reprinted from Baldwin's Kentucky Revised Statutes Annotated (Official Edition)." On page 1 of Title L, September 1984 update of Baldwin's Kentucky Revised Statutes Annotated (Official Edition), reprinted in *Criminal Law of Kentucky* (1992–93), p. 633, is the following:

> Publisher's note: Explanatory notes, designated COMMENTARY (1974), have been brought forward from our 1975 publication of Title L. These notes were prepared AFTER enactment of the Penal Code and are NOT "Commentary accompanying this Code" referred to in KRS 500.100.

These unofficial notes are based on Commentary which accompanied the final draft of the Penal Code in 1971, published by the Kentucky Crime Commission and the Legislative Research Commission. These notes were revised by the former Department of Justice and the Legislative Research Commission to conform the material to the Penal Code as finally amended and enacted.

Even if this Commentary were somehow an official interpretation of the will of the Legislature, it would only be relevant to the statute for which it was written. The statute was changed in 1984 and in 1976. This Commentary was never written by the Legislature to include information regarding those statutory changes. It was based on the statute as it appeared at that time, not the present. *Cf. Commonwealth v. Hinton,* Ky., 678 S.W.2d 388 (1984).

In my view, this Commentary is really a series of "unofficial notes" published by the Kentucky Crime Commission and the L.R.C. after being revised by the former Department of Justice and L.R.C. to conform to the Penal Code. This Court has previously decided that L.R.C. may not speak for and in place of the Legislature. *L.R.C. v. Brown,* Ky., 664 S.W.2d 907 (1984). Adding the Kentucky Crime Commission and the former Department of Justice does not change that

holding. The material presented cannot possibly provide "the legislative history for the Penal Code."

For a further example of the lack of reliability of the Commentary as published in *Criminal Law of Kentucky,* the last paragraph of the Commentary associated with KRS 506.070 appears after the section on "Relationship to pre-existing law" and is NOT reprinted in *Criminal Law of Kentucky,* although it clearly is a discussion of KRS 506.070(3) and appears in the Baldwin's KRS annotated.

In these cases, the convictions should be affirmed.

REYNOLDS and SPAIN, JJ., join in this dissent.